1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4
    UNITED STATES OF AMERICA,      )        3:19-CR-112-K-1
5              Government,         )
                                   )
6                                  )
    VS.                            )        DALLAS, TEXAS
7                                  )
                                   )
8   CENGIZ JAN COMU,               )
               Defendant.          )        January 18, 2023
9

10
                  TRANSCRIPT OF SENTENCING HEARING
11
                 BEFORE THE HONORABLE ED KINKEADE
12
                  UNITED STATES DISTRICT JUDGE
13

14
    A P P E A R A N C E S:
15

16
    FOR THE GOVERNMENT:        MR. CHRISTOPHER FENTON
17                             U.S. Department of Justice
                               Criminal Division, Fraud Section
18                             1400 New York Avenue NW
                               Bond Building
19                             Washington, DC  20005
                               (202) 320-0539
20                             christopher.fenton@usdoj.gov

21                             MR. THEODORE M. KNELLER
22                             U.S. Department of Justice
                               Criminal Division, Fraud Section
23                             1400 New York Avenue NW
                               Bond Building
24                             Washington, DC  20005
                               (202) 514-5799
25                             theodore.kneller@usdoj.gov

```
 1                              MS. MARY F. WALTERS
                               U.S. Attorney's Office
 2                             1100 Commerce Street
                               Third Floor
 3                             Dallas, Texas  75242
                               (214) 659-8685
 4                             mary.walters@usdoj.gov

 5

     FOR THE DEFENDANT:        MR. DANIEL KEVIN HAGOOD
 6                             Daniel K. Hagood PC
                               3710 Rawlins Street
 7                             Suite 1600
                               Dallas, Texas  75219
 8                             (214) 720-4040
                               dhagood@hagoodhunt.com

 9

10                             MS. ALEXANDRA HUNT
                               Attorney at Law
11                             3710 Rawlins Street
                               Suite 1600
12                             Dallas, Texas  75219
                               (214) 720-4040
13                             ahunt@hagoodhunt.com

14
                               MR. BRIAN DANIEL POE
15                             Brian D. Poe Attorney PLLC
                               909 Throckmorton Street
16                             Fort Worth, Texas  76102
                               (817) 870-2022
17                             bpoe@bpoelaw.com

18
     COURT REPORTER:           MR. TODD ANDERSON, RMR, CRR
19                             United States Court Reporter
                               1100 Commerce St., Rm. 1625
20                             Dallas, Texas  75242
                               (214) 753-2170
21

22

23         Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1                SENTENCING HEARING - JANUARY 18, 2023
 2                    P R O C E E D I N G S
 3           THE COURT:  Okay.  All right.  We're going to do Comu
 4     first.
 5           Case of United States of America versus Cengiz Jan
 6     Comu -- it may be Jan -- Cause Number 3:19-CR-112-K.
 7           Mr. Fenton, Mr. Kneller, Ms. Mary Walters are all --
 8     well, y'all are back.  You're here today.
 9           MR. FENTON:  We are, Your Honor.  Good morning.
10           THE COURT:  You've made Mr. Kneller and Ms. Walters
11     do the others.  I'm glad you came today.
12           MR. FENTON:  Thank you, Your Honor.  It's good to see
13     you.
14           THE COURT:  Good to have you.
15           Ms. Walters, are you sick?
16           MS. WALTERS:  Yes.  I have a cold.  I've tested
17     negative for COVID twice, but I'm just trying to be thoughtful
18     of others.
19           THE COURT:  Okay.  All right.  Well, I'm glad that
20     you are, but if I can't hear you as you muddle through -- Okay.
21     Now I can hear you.  If I can't, I'll tell you, okay?
22           MS. WALTERS:  Thank you, Judge.
23           THE COURT:  But I don't want you to get sick or get
24     us sick.
25           MS. WALTERS:  Right.
```

```
 1              THE COURT:  And then I've got Mr. Hagood.  Good to
 2    see you again, sir.
 3              MR. HAGOOD:  Good morning, Your Honor.
 4              THE COURT:  And, Ms. Hunt?
 5              MS. HUNT:  Yes, Your Honor.
 6              THE COURT:  How are you?
 7              MS. HUNT:  I'm doing well.  How about you?
 8              THE COURT:  Good.
 9              And I'm assuming that you and Mr. Poe are the -- let
10    me think through this.  Y'all are the book lawyers on this
11    matter, not that Mr. Hagood doesn't know how to look it up.  I
12    just know him as a trial lawyer.  So did I guess that right?
13              MS. HUNT:  I would say so, Your Honor.
14              THE COURT:  Okay.  Good.  All right.
15              Well, y'all -- and I see Mr. Comu over there.  Good
16    to see you, sir.
17              THE DEFENDANT:  Good morning.
18              THE COURT:  All right.  Okay.  Thank y'all.
19              Okay.  Why don't you come up here for just a minute
20    with him, and I'll go through the prelims with him.
21              Okay.  Mr. Comu, on March 10, 2020, you pled guilty
22    before United States Magistrate Judge Renee Toliver to Counts
23    One through Twenty-Three of a 23-count superseding indictment
24    that was filed on November 6, 2019.
25              Count One, you pled guilty to conspiracy to commit
```

1    mail and wire fraud; Counts Two through Eleven, mail fraud; and

2    Counts Twelve through Twenty-One, wire fraud, in violation

3    of -- excuse me -- and then Counts Twenty-Two and Twenty-Three

4    you pled guilty to money laundering and aiding and abetting.

5            There's no plea agreement.

6            I accepted your guilty plea on March 25, 2020.

7            And as part of the plea today I will dismiss the

8    original indictment, because we're proceeding on the

9    superseding indictment; isn't that correct?

10           MR. FENTON:  Yes, Your Honor.

11           THE COURT:  Okay.  Good.

12           All right.  So we've got the guidelines on offense --

13   it will be an offense level 43, criminal history category I.

14           So it's -- Counts One through Twenty-Three would put

15   it at 5,280 months.  And the statute, of course, is zero to 20

16   on Counts One through Twenty-One; and Counts Twenty-Two and

17   Twenty-Three, zero to ten.

18           And the supervised release range is one to three.

19           The fine range is $50,000.00 to $24,854,623.22.

20           Restitution in this case --

21           Have y'all agreed to restitution, Mr. Hagood?

22           MR. HAGOOD:  No, sir.

23           THE COURT:  No, you have not?

24           MR. HAGOOD:  (Indicating in the negative)

25           THE COURT:  Okay.  But the amount that's being sought

1    is $12,427,311.61.

2          There are a number of objections that you've made,

3    Mr. Hagood.  I do have those.  And you can go over them

4    individually.  You can pick out certain ones.  You can stand on

5    what you've already filed.  That's up to you.  And I'm ready to

6    hear that.

7          And when we finish that, I then want you to go

8    into -- I've got both your sentencing memoranda, a number of

9    supportive letters that I already have.  And I've been through

10   your sentencing memoranda.  And I think I've been through all

11   the letters.  There may be some that have come in that I

12   haven't seen.

13         And I don't think the Government has any objection to

14   the presentence report, or do you?  No?

15         MR. FENTON:  No, Your Honor.

16         THE COURT:  Okay.  All right.  So that's kind of

17   where we are.

18         I've already sentenced co-defendants Mr. Kadish,

19   Mr. Green, and Ms. Gagnier.  And so that's where we are today.

20   And I'm glad for you to go over those objections at this time.

21         Yeah, here's the supportive letters.  Okay.  Thank

22   you.

23         MR. HAGOOD:  Judge, how would you like to handle the

24   objections, one at a time or --

25         THE COURT:  You can -- I'm going to let you decide

1    how you'd like to do it, and that will be fine with me.  I'm
2    not that picky about it.
3              If you'll pull that microphone over, though, so the
4    court reporter can hear you.  This -- unfortunately, this
5    courtroom is not very conducive to being able to hear unless
6    you're talking right into that microphone.
7              MR. HAGOOD:  Yes, sir.
8              I'm going to have Ms. Hunt address the objections,
9    Judge.
10             THE COURT:  Oh, that's fine.  Great.
11             Ms. Hunt, how long have you been with Mr. Hagood?
12             MS. HUNT:  For about seven years, Your Honor.
13             THE COURT:  Is that right?  Did you go right out of
14   school?
15             MS. HUNT:  Yes, Your Honor.  Well, while I was in
16   school even.
17             THE COURT:  You were working for him while you were
18   in school and then went to -- stayed there all this time?
19             MS. HUNT:  Yes, Your Honor.
20             THE COURT:  Did you go to SMU?
21             MS. HUNT:  I did.
22             THE COURT:  Well, good.  Well, good to have you.
23             Go ahead.
24             MS. HUNT:  So first with the loss amount, Your Honor,
25   we would submit that --

```
 1                THE COURT:  Pull that microphone around.

 2                MS. HUNT:  Is that better?

 3                THE COURT:  It's much better.  But you don't -- I

 4     don't think you have to lean down.

 5                MS. HUNT:  Okay.

 6                THE COURT:  You just have to have it in front of you.

 7                MS. HUNT:  So the Government's calculation determined

 8     that the loss amount comes in at $12,427,311.61.  We would

 9     submit for basically three key reasons, Your Honor, that the

10     more correct loss amount would be $9,255,239.46 based on three

11     categories of adjustments that we believe need to be made.

12                So the first, Your Honor, if you review the most

13     recent, the second addendum to the PSR, they list a figure that

14     they refer to as the actual loss, and then they include a

15     description of the victims' statements and comments that were

16     submitted in response to Probation's inquiry of the victims.

17     And for a number of them, the amount stated by the victim is

18     lower, some cases substantially lower, than the amount listed

19     as the actual loss.

20                So we have totalled the difference between those

21     amounts, Your Honor, as the first category of adjustment that

22     we submit needs to be made.

23                And then there are two loans, Your Honor, which

24     throughout much of the evidence have been clearly identified as

25     loans but which the Government takes a position were
```

1    investments.

2              One of the loans was made by Ward Capital and one by

3    Sam Rose.  And as early, Your Honor, as the forfeiture

4    affidavit, the agent investigating this case identified that

5    that amount of funds, $2.67 million total as loans, described

6    then as such, identified both those parties as lenders to

7    EarthWater, not -- and separated them out.

8              And then also, Your Honor, in the materials submitted

9    by Ward Capital to the Probation Office, they discuss it in

10   terms of the loans.  And also in the PSR addendum the notes

11   reflecting, I guess, those materials also discuss these amounts

12   as loans.

13             So we would submit that those amounts should be

14   removed from the total loss.

15             And then finally, Your Honor, also referenced in the

16   submission by Ward Capital they've outlined a number of

17   payments that were made towards those loans, for a total amount

18   of $293,597.22, which we would submit also should be subtracted

19   from the total loss amount.

20             So with those three adjustments, Your Honor, you

21   arrive at 9.255, which, of course, would drop down to the next

22   category, according to the guidelines, for a plus-18 rather

23   than a plus-20.

24             And, Your Honor, in order to help illustrate that, we

25   have prepared a brief spreadsheet, and we have a copy of the

```
 1    submission by Ward Capital.  We would offer those as Exhibits
 2    16 and 17 if Your Honor --
 3              THE COURT:  Have you given those to the Government?
 4              MS. HUNT:  We have.  We provided a copy of all our
 5    exhibits to the Government.
 6              THE COURT:  Okay.  So they have all of them?
 7              MS. HUNT:  Yes, Your Honor.
 8              THE COURT:  And this is 18?  What's the exhibit
 9    number?
10              MS. HUNT:  Defendant's 16 and 17, Your Honor.
11              THE COURT:  Okay.  I'm sorry.  16 and 17.
12              Do you have any objection to those being admitted for
13    the hearing?
14              MR. FENTON:  No, Your Honor.
15              THE COURT:  All right.  They're admitted.
16                 (Defendant's Exhibit Nos. 16 and 17 received)
17              THE COURT:  Okay.
18              MS. HUNT:  May I approach, Your Honor?
19              THE COURT:  Sure.  Just give them to Ronnie.
20              Thank you, Ronnie.
21              Okay.  Could you -- this is really pretty large
22    print.  If you could have made it smaller --
23              MS. HUNT:  I apologize, Your Honor.
24              THE COURT:  -- I could have gotten an electron
25    microscope up here to read this, but --
```

```
 1              MS. HUNT:  It is quite small.

 2              THE COURT:  I'm kidding.  I'm giving you a hard time.

 3   I've got new glasses, so I'm okay.

 4              Okay.  On that one issue -- you're finished on that

 5   one issue?

 6              MS. HUNT:  Yes, Your Honor.

 7              THE COURT:  Let me let the Government address that

 8   one objection.

 9              MR. FENTON:  Yes, Your Honor.

10              So on loss, the loss amount was calculated very

11   simply, basically took --

12              THE COURT:  Okay.  Is that microphone on?

13              MR. FENTON:  Sorry, Your Honor.  Is this better?  Can

14   you hear me now?

15              THE COURT:  I don't know if it's better or not.  I

16   don't think so.

17              There we go.

18              MR. FENTON:  Okay.  So we calculated the loss very

19   simply.  We just aggregate -- we looked at the bank records for

20   the EarthWater account.  We identified all of the checks that

21   came into that account from investors.  We also identified all

22   wires that came in from investors.

23              To the extent -- that is it.  That is the loss.  That

24   is a very simple, straightforward, reliable calculation.  It's

25   based on bank records.
```

1          The first category that Defendant argues should
2   reduce the loss amount is based on a discrepancy between what
3   the victims remember today and the amount of money that they
4   sent in years ago.

5          The Defendant shouldn't benefit from that discrepancy
6   particularly where a number of these victims were elderly
7   individuals who today just don't have the recollection that
8   they may have years ago.

9          The bank records control.  They trump.

10          The second category for the reduction are these loans
11   that were purportedly made.

12          Loans is shorthand sometimes for convertible debt
13   securities.  These are just other forms of securities.  It's
14   debt that is convertible into equity.  And that is exactly what
15   Ward purchased here.

16          And we provided to Your Honor in Exhibit 9 along with
17   our submission a copy of the documents, the agreements signed
18   by Mr. Comu, clearly understood the terms of those agreements,
19   explaining that while they are loans in some sense, the
20   value -- that investment value that's derived is from the
21   conversion of debt to equity.

22          That conversion to equity was -- essentially, the
23   attractiveness is based on Mr. Comu's promise that the company
24   would go public.  That, of course, could never happen, because,
25   as he's admitted, they were lying about how they were using

 1  investor funds.

 2          The third category is just the payments that Ward

 3  Capital made that were received from EarthWater on the loan.

 4          The point here really is that Ward Capital is

 5  fraudulently induced into entering into the convertible debt

 6  security based on the lies that the Defendant had told them.

 7  So that should be included as a loss.  That is not separable.

 8  You can't separate that out from the -- from the amount that

 9  they paid for the convertible debt.

10          THE COURT:  Okay.  Go to the next one.

11          MS. HUNT:  May I respond very briefly, Your Honor?

12          THE COURT:  Sure.

13          MS. HUNT:  I would just note we -- we understand that

14  the Government asserts that they calculated the loss amount via

15  the bank records, but if you look at the amounts calculated in

16  the various iterations of the PSR, that amount fluctuates quite

17  significantly, which doesn't -- seems inconsistent with the

18  idea that it's all based on the bank records, which haven't

19  changed since 2019.

20          In the original PSR, the loss amount was calculated

21  at 10.9 million.  Then by August of '20, in the addendum it was

22  up to 11.3.  And then most recently, January 13th, it was up to

23  12.4.  So that is one other aspect of our discrepancy with the

24  loss amount, is that --

25          THE COURT:  Let me stop you.

1            Why did it go up, Government?

2            MR. FENTON:  Yes, Your Honor.

3            As the Government continued its investigation and

4    aggregated the bank records and went through that process, the

5    number grew.

6            THE COURT:  As what, now?

7            MR. FENTON:  As the Government went through and

8    tabulated the losses, including the convertible debt securities

9    from Ward Capital and, you know, other information that we

10   found in the bank records, the number increased over time.

11           THE COURT:  I mean, the bank records didn't change,

12   did they?

13           MR. FENTON:  No, but the work that was being done

14   with the bank records.  We continued to work on the records.

15           The exhibit that we provided to the Court is just

16   based -- it's based on the bank records.

17           THE COURT:  What, did you find more bank records?

18           MR. FENTON:  We went through and continued to work

19   through those bank records.

20           THE COURT:  Okay.  That -- work through?

21           MR. FENTON:  So we had to consult --

22           THE COURT:  I won't say what that sounds like, but in

23   the news days, it sounds like what I'm hearing on some of the

24   national news about somebody trying to find things.

25           But, anyway, work through isn't an answer.  I need an

1 | answer.

2 | MR. FENTON:  So, Your Honor, we -- the Government

3 | hired a consultant to look at the bank records and add up all

4 | the checks and add up all the wires.  And part of what we did

5 | as part of that process was try to identify who the investors

6 | were, sometimes based on what was indicated in the wire

7 | confirmations or in the check subject lines, the memos, or

8 | sometimes we would go back and find the actual stock purchase

9 | agreements that would confirm that these individuals were

10 | indeed people who had purchased stock and tie the check to

11 | that.  So that was a process that took some time.

12 | THE COURT:  So when you were at 10, there was a group

13 | out there you missed?

14 | MR. FENTON:  There were some that were not included.

15 | And in addition to that, we also --

16 | THE COURT:  Why?

17 | MR. FENTON:  The Ward Capital --

18 | THE COURT:  I mean, why weren't they?

19 | MR. FENTON:  Because we were -- as I said, we

20 | were going through --

21 | THE COURT:  I can understand the Ward Capital, but is

22 | that -- does that take the whole $2 million?  Does that get it

23 | from 10 to 12?

24 | MR. FENTON:  That -- well, it's $1.5 million.

25 | THE COURT:  Okay.  That takes care of 1.5 --

```
 1                    MR. FENTON:  Yes.

 2                    THE COURT:  -- of that discrepancy?  Okay.

 3                    MR. FENTON:  See, that's a large -- that's --

 4     that's --

 5                    THE COURT:  A large portion?

 6                    MR. FENTON:  That's a large part of it.  And then the

 7     rest of it was just at that time not yet confirmed, and we were

 8     taking our time and looking at stock purchase agreements and

 9     other --

10                    THE COURT:  Going through what?

11                    MR. FENTON:  Going through the bank records.  And

12     where we had a check from an individual and we wanted to

13     confirm that that individual was an investor, we would go back

14     and find the stock purchase agreement and confirm it.

15                    THE COURT:  Okay.  I'm not sure -- I mean -- I mean,

16     I don't know why you couldn't get it the first round.  I don't

17     get why you didn't -- everything except the -- what was the

18     name of that other lender?

19                    MR. FENTON:  Ward Capital.

20                    THE COURT:  Other than Ward Capital, why didn't you

21     catch it all the first round?

22                    MR. FENTON:  Ward Capital indeed accounts for the

23     largest delta.  That's the --

24                    THE COURT:  I get that, but what about the rest of

25     it?
```

1          MR. FENTON:  They were just not yet confirmed.  We
2    were going through the confirmation process.
3          THE COURT:  You mean you didn't have their names, or
4    you found a check and you couldn't tell who had written it
5    or --
6          MR. FENTON:  Exactly, Your Honor.
7          Maybe we had found a check and we had a name, and we
8    didn't know -- it didn't say on the check if that individual
9    had -- if -- that it was for a stock purchase, so we would go
10   and find the stock purchase agreement that corresponded with
11   that check.
12         THE COURT:  Okay.
13         MR. FENTON:  That accounted for a small amount.
14         THE COURT:  Okay.  Okay.  Anything else on that?
15         MS. HUNT:  No, Your Honor.
16         THE COURT:  All right.  Next one?
17         How many of these are there?  18?
18         MS. HUNT:  There are 16 objections, but I am not
19   planning to go through all of them, Your Honor.
20         THE COURT:  It's okay if you need to, Ms. Hunt.  I'm
21   not fussing at you.  I just want to make sure I've got it all
22   down here.
23         All right.  Next?
24         MS. HUNT:  So next, Your Honor, we would have the
25   substantial financial hardship enhancement.  And on that we

1    would submit that the Government hasn't met its burden to

2    submit enough proof to establish that all of these victims

3    actually had a substantial financial hardship.

4          The main method that they used in order to make these

5    determinations was they sent out sort of a worksheet to the

6    victims and had them fill it out, but it essentially amounts,

7    Your Honor, to a checklist where it line items out the various

8    ways that you could qualify for a substantial financial

9    hardship and allows them to check the box of whether they

10   believe that they did suffer that circumstance.

11         THE COURT:  What's -- where's the line?

12         MR. FENTON:  There's not a dollar amount, Your Honor,

13   but they --

14         THE COURT:  No.  What makes you a sophisticated

15   investor that you wouldn't fit in this category of it being a

16   substantial hardship, you know?  Only rich people?  I mean, is

17   there -- what's your standard?

18         Obviously some of these people had a financial

19   hardship.  Agreed?  Some of them?

20         MR. FENTON:  Agreed.  Certainly, Your Honor.

21         THE COURT:  Okay.  So where's the cutoff?

22         MR. FENTON:  Maybe perhaps to give an example I think

23   might answer your question, Your Honor.

24         There are a number -- about 14 or so victims who had

25   a $5,000.00 loss or less who indicated that they suffered a

 1  substantial financial hardship.  And in response to the
 2  Government's inquiry, they simply checked the box but provided
 3  no additional information.
 4          One of them, Your Honor, had a loss of $1,244.05 and
 5  checked the box that he had substantial changes to his living
 6  arrangements as a result of that loss.
 7          THE COURT:  How much do you think is in this category
 8  that it shouldn't be?
 9          MS. HUNT:  I would certainly say --
10          THE COURT:  I mean, you haven't calculated that?
11          MS. HUNT:  I have not made that calculation, Your
12  Honor.
13          THE COURT:  You're just saying the Government didn't
14  prove it, so they can't get any of it?
15          MS. HUNT:  Well, they didn't provide enough evidence
16  even really to evaluate the legitimacy of these claims.
17          THE COURT:  So what would they need to do?  Have a
18  financial statement on everybody and then look and see how it
19  affected them and go through that kind of analysis?
20          MS. HUNT:  If perhaps even a net worth of the
21  individual, Your Honor.  That might give at least a standard to
22  measure it against to determine if that was substantial,
23  because obviously the amount that's substantial changes
24  depending on the individual's circumstances.  But without any
25  information to sort of backstop these assertions when they're

1    just plain like that, it's difficult to evaluate.

2            THE COURT:  I get it.

3            Okay.  Government?

4            MR. FENTON:  Yes, Your Honor.

5            The process that was relied upon here was

6    Probation's -- the materials that were mailed out by Probation

7    to the individuals, Victim Assistance, where they respond under

8    oath as to how this impacted them.  So we're relying upon the

9    under-oath statements of the victims.

10           With respect to the amount -- and 72 victims

11   responded.  So there are far, far -- that number is far in

12   excess of 25 that's required for this enhancement to apply.

13           THE COURT:  How much was the enhancement?  Two

14   levels?  Three levels?

15           MR. FENTON:  It's -- it's a six-level enhancement.

16           THE COURT:  Six level?

17           MR. FENTON:  Twenty-five or more victims.  And then

18   there are other levels for five or more.

19           THE COURT:  Okay.

20           MR. FENTON:  There was a large number of victims.

21           THE COURT:  Okay.  I understand that.  All right.

22           MR. FENTON:  The one additional point I just wanted

23   to make was Ms. Hunt is really focusing on the $5,000.00 and

24   arguing, well, how can $5,000.00 really matter to these

25   individuals?

```
 1              I just want to point out to Your Honor, the $5,000.00
 2   mattered to Mr. Comu because a large number of these investors
 3   invested $5,000.00.  And Mr. Comu and his co-conspirators spent
 4   substantial time trying to convince these individuals to part
 5   with that $5,000.00.
 6              So to now argue that the $5,000.00 is but a mere
 7   pittance is kind of ironic in that context.  It clearly
 8   mattered to these individuals, and we take them for their word
 9   that it harmed them substantially.
10              THE COURT:  I get it.
11              Okay.  All right.  Go ahead.  Next?
12              MS. HUNT:  Your Honor, the enhancement for a
13   violation of a prior judicial order, there are two orders at
14   issue.  One is an SEC order.  And on that one, Your Honor, we
15   would submit that if you read the text of the order itself, it
16   limits the application of the order to, quote, for purposes of
17   this action only.
18              And it also -- when it defines in the body of the
19   order what is being prohibited, it again refers to the
20   specifics of that case, Your Honor.  For example, it discusses
21   obtaining money or property by means of any untrue statement of
22   a material fact concerning but not limited to the quality of
23   the investment being sold, specifically including the yield of
24   gold or other minerals to be found.
25              So both at the outset where it specifically limits
```

 1    its application to that action only and further confirms that
 2    in the body, we would submit, Your Honor, that that order has a
 3    very limited applicability and that it applied to that
 4    proceeding and that investment.
 5           With respect to the Wisconsin order, Your Honor, we
 6    would frankly submit that Comu didn't do anything to violate
 7    that order.
 8           There was only one victim who was identified as being
 9    from Wisconsin, Your Honor.  And a review of the notes about
10    that victim shows that it was two of Mr. Comu's co-defendants,
11    Filippo and Price, who actually sold the investment to that
12    individual and interacted with him.
13           So in that regard, Your Honor, we would just submit
14    that Comu did not take any action which would be violative of
15    the Wisconsin order.
16           THE COURT:  Okay.  Government?
17           MR. FENTON:  Yes, Your Honor.
18           The Court had already found that Mr. Comu violated
19    the terms of the SEC order back when the Court considered
20    Mr. Comu's appeal of the revocation of bond.  And we think that
21    the Court's decision at that time was correct.  The plain
22    language of the order and the stated purpose of the order was
23    to prohibit Mr. Comu from ever selling unregistered securities
24    again.
25           And the example that Ms. Hunt cites is one type of

1    misrepresentation that he is prohibited from making in the

2    future.  But if you look at the language of the order, it

3    clearly applies to any security in the form of investment

4    contracts or any other security, and also applies to the

5    purchase and sale of investment contracts or any other

6    security.  And that phraseology is used repeatedly throughout.

7              So the Government contends that that clearly

8    prohibits -- it's a broad prohibition that is limitless in time

9    and that was something that Mr. Comu actually negotiated at

10   that time as a way to avoid other sanctions from the SEC.

11             THE COURT:  Okay.  Next?

12             MS. HUNT:  Sophisticated means, Your Honor.

13             On this one, we would submit that the fraud at issue

14   is simply very straightforward.  They lied about the amount of

15   commissions that would be paid to the salespeople out of the

16   investment amounts and obviously said it would be no more than

17   10 percent when really it was up to 50 percent at times.

18             There's nothing sophisticated about that, Your Honor.

19   It's just simply lying to the investors.

20             The idea that Regus was somehow a shell corporation

21   designed to shield the true nature of the scheme also, Your

22   Honor, is simply not the case here.  In the PPM, Regus was

23   explicitly cited and referenced, and they disclosed not only

24   the ownership interest of Mr. Comu and one of his co-defendants

25   in Regus but also clearly laid out that Regus was entitled to

1    an annual advisory fee.

2          So certainly it can't be said that that was any type

3    of clandestine operation, hidden, or, you know, otherwise

4    disguising the true nature of the parties.

5          And finally, Your Honor, the fact that Kadish had, I

6    believe, a sales operation located in Florida was really of no

7    consequence to the scheme overall.  It did not facilitate, you

8    know, any of the investors not being able to reach EarthWater

9    or anything of that nature.  It simply happened to be where he

10   was located.  It certainly wasn't anything that Mr. Comu sought

11   out and didn't honestly, Your Honor, have any real bearing on

12   the scheme overall.

13         So, Your Honor, we would submit that none of those

14   examples that are cited in the PSR are sufficient to warrant

15   the application of sophisticated means.

16         THE COURT:  Okay.

17         Yes, sir.  Government?

18         MR. FENTON:  Thank you, Your Honor.

19         Ms. Hunt's disagreement here is really with the

20   Sentencing Guidelines itself.  The comment in the guidelines

21   says that sophisticated means is usually indicated where you

22   have a telemarketing scheme --

23         THE COURT:  Make sure you -- I just can barely hear

24   you.

25         MR. FENTON:  Oh, I'm sorry, Your Honor.

1          Sophisticated means -- the comments to the Sentencing

2    Guidelines indicate that sophisticated means generally applies

3    where there's a telemarketing scheme where the main office of

4    the scheme is located in one jurisdiction and soliciting

5    operations are located in other -- in another jurisdiction and

6    where there is conduct such as hiding assets or transactions or

7    the use of fictitious entities, corporate shells, offshore

8    financial accounts.  And that is exactly what happened here.

9          With the exception of the offshore financial

10   accounts, we have all of those facts -- facts basically in

11   this -- in this case.

12          THE COURT:  I understand that argument.  Thank you.

13          MR. FENTON:  We would argue that it applies.

14          THE COURT:  I understand.  Thank you.

15          Next, Ms. Hunt?

16          MS. HUNT:  A violation of securities law, Your Honor.

17          Mr. Comu did not occupy any of the roles outlined in

18   that enhancement.  He was not an officer, director of a

19   publicly traded company, not a registered broker/dealer, and

20   not an investment advisor.

21          So for that reason, Your Honor, we would submit the

22   enhancement --

23          THE COURT:  What was he?

24          MS. HUNT:  A CEO and president of a not publicly

25   traded company, Your Honor.

```
 1                    THE COURT:  Okay.
 2                    MS. HUNT:  And also something that the PSR really
 3         doesn't discuss was the fact that EarthWater was selling its
 4         securities pursuant to the exemption under Rule 506 for
 5         accredited investors.
 6                    So the idea that there could be a securities law
 7         violation for selling unregistered securities unlawfully
 8         wouldn't apply here because there would have to be a
 9         requirement that the securities were registered, and here they
10         were being offered pursuant to an exemption.
11                    So for those reasons, Your Honor --
12                    THE COURT:  And the exemption is they were accredited
13         investors?
14                    MS. HUNT:  Yes, Your Honor.
15                    THE COURT:  What makes them an accredited investor?
16                    MS. HUNT:  They each certified that they were an
17         accredited investor and signed, you know, a stock purchase
18         agreement to that effect.
19                    THE COURT:  Okay.  I know what they signed, but what
20         is the requirement?  You've got to have X amount of dollars?
21                    MS. HUNT:  A net worth of over $1 million, I believe,
22         Your Honor, or be able to withstand a loss of the entire
23         investment.  There are several different criteria.  I don't
24         recall them all, Your Honor, but --
25                    THE COURT:  Okay.  But you've got to -- you've got to
```

```
 1    have a certain amount, don't you?  A certain amount of money to
 2    be able to be an accredited investor?
 3              MS. HUNT:  That is certainly one way to qualify, Your
 4    Honor.
 5              THE COURT:  But you can qualify without having -- I
 6    could have no money and I could still qualify?
 7              MS. HUNT:  I believe, Your Honor, if you had enough
 8    money to withstand a complete loss of the investment.  It
 9    doesn't set out a specific benchmark in that situation.  One
10    way would be if you have a net worth of $1 million or more, but
11    another way, based on my understanding, would be if you could
12    bear a complete loss of the investment without suffering
13    significant financial hardship.
14              THE COURT:  And they all signed those, saying they
15    were?
16              MS. HUNT:  Yes, Your Honor.
17              THE COURT:  Okay.  All right.  Next?
18              Do you want to address that?
19              MR. FENTON:  Just briefly, Your Honor.
20              On the accredited investors claim, I think it's
21    important to point out that the way that the Defendant uses
22    this is wrong as a matter of law.  And the reason why is
23    because there is a requirement under the applicable regulations
24    that the person who is selling the stock verify that they take
25    steps to confirm.  And here, that was not done.  And the
```

1    Government would posit that that was because that was not an

2    actual attempt to verify.  It's basically a way to excuse

3    blame.

4              And in addition to that, it's just willful blindness.

5    They're just blinding themselves to the fact that these

6    individuals who are making $5,000.00 investments clearly are

7    not sophisticated investors.  They are not accredited --

8    accredited investors.

9              THE COURT:  I mean, you could be a sophisticated

10   investor and just say, "I'll put $5,000.00 in this thing," but

11   it would be pretty rare.

12             But the thing that you're saying is, it's on the

13   person selling to verify?

14             MR. FENTON:  Yes, Your Honor.

15             THE COURT:  Okay.  Hey, Ronnie, can you turn that

16   microphone up?

17             THE CLERK:  Yes, sir.

18             THE COURT:  Go ahead, Ms. Hunt.

19             MS. HUNT:  Thank you, Your Honor.

20             Moving on to the next one, Your Honor, vulnerable

21   victims.

22             So as we discussed extensively in our briefing, Your

23   Honor, the case law is clear that a victim is not vulnerable

24   merely by virtue of being over a certain age.  It requires an

25   additional vulnerability beyond simply having hit a certain

1       age, Your Honor.  But really that's all the evidence that the

2       Government has put forward to justify this enhancement, Your

3       Honor.

4              There's not -- there's not been a showing, for

5       instance, that the Defendants targeted an assisted living

6       facility or a memory care center to where they would be

7       specifically seeking out especially vulnerable people even

8       beyond the age limit as the statute contemplates or the

9       guideline contemplates.

10             Also, Your Honor, Mr. Comu obviously was -- had a

11      very different role than the salesmen who were the ones really

12      responsible for coming up with these leads, contacting the

13      leads, determining who and how they would contact them.  So he

14      really didn't have visibility over the sources of where the

15      salesmen were getting the leads and that type of thing.  So he

16      didn't have the same visibility over the characteristics of the

17      victims as they did.

18             And, Your Honor, I think it's also worth noting that

19      even when the Government was trying to determine how many of

20      these victims were over a certain age, it took them years-long

21      investigation to come up with a good amount of the ages.  But

22      still, Your Honor, I believe they've not been able to determine

23      the ages of all the victims, which I would submit is evidence

24      that they weren't being targeted on that basis if -- even with

25      access to all the discovery in this case, it required

1   additional investigation to determine.

2           THE COURT:  Okay.  I understand that argument.

3           Government?

4           MR. FENTON:  Thank you, Your Honor.

5           There are two independent bases for the vulnerable

6   victim enhancement adjustment.  One, it has never been

7   addressed by the defense, and that is the fact that they are

8   reloading these victims.  They are identifying victims who have

9   proven susceptible to the fraud and revictimizing them over and

10  over and over again.  That --

11          THE COURT:  Is there a number that it has to be to be

12  to have -- to get this added to the guidelines, like 25 or 30

13  or 50 people, or no?  I don't know.  The vulnerable victim.

14          MR. FENTON:  No, Your Honor.

15          THE COURT:  It can be one?

16          MR. FENTON:  Yes, Your Honor.

17          THE COURT:  Okay.  All right.

18          MR. FENTON:  Here, though, we've identified at least

19  124 victims who were reloaded 200 -- a total of 292 times on

20  top of their initial investment.  This was characteristic of

21  the scheme.  It's why it was so successful for Mr. Comu and his

22  co-conspirators.

23          In addition to that, the second bases is the fact

24  that these individuals -- a lot of the individuals who were

25  targeted were elderly.  And here we would point to the fact

```
 1    that the entire company, the investment opportunity was -- was

 2    presented, was marketed as this kind of fountain of youth; this

 3    idea that if you drink this, it can get better.

 4            And one of the things that was done here by Mr. Comu

 5    and his co-conspirators was to actually send product out as a

 6    prop to get the victims to invest again.

 7            So we would argue that for either -- either one of

 8    those bases the vulnerable victim adjustment is appropriate.

 9            THE COURT:  Okay.  Go ahead.

10            MS. HUNT:  Obstruction of justice, Your Honor.

11            This issue in particular has been very extensively

12    briefed, so I won't repeat all of that, but --

13            THE COURT:  All right.

14            MS. HUNT:  -- the key point, Your Honor, in our

15    perspective is that none of the conduct discussed in any of the

16    briefing constituted threatening, intimidating, or unlawfully

17    influencing a co-defendant, witness, or juror, or certainly did

18    not constitute destroying or concealing any evidence in this

19    case.  So --

20            THE COURT:  I understand that argument.

21            Government?

22            MR. FENTON:  Your Honor, again, there's two

23    independent bases for the application of this adjustment, one

24    of which is the fact that the Defendant has repeatedly lied to

25    the Court and also to Magistrate Judge Rebecca Rutherford
```

 1    throughout the course of these proceedings.

 2              The second bases is everything that he did to violate

 3    his conditions of release and tried to hide that from the

 4    Government and the Court.  The reason why that is obstruction

 5    of justice is because the goal was basically to convince the

 6    victims who would -- some of whom would have probably testified

 7    at trial that they were indeed not victimized, that they got

 8    something of value for parting with their money.  And that's

 9    why the Government contends that it's obstruction of justice.

10    It's essentially a form of witness tampering.

11              THE COURT:  Okay.  All right.  Next?

12              MS. HUNT:  Last one, Your Honor, acceptance of

13    responsibility.

14              We would submit that by pleading guilty to all 23

15    counts of the superseding indictment in a timely manner,

16    admitting to the conduct as laid out in the factual resume, and

17    also, Your Honor, he did additionally resign voluntarily from

18    the office of CEO/president that he formerly held at

19    EarthWater, he has achieved or satisfied the basic elements or

20    factors set out in 3E1.1 in order to qualify for an acceptance

21    reduction, we would submit, Your Honor.

22              THE COURT:  Well, why doesn't he lose it because of

23    his actions on pretrial release?

24              MS. HUNT:  Your Honor, we would take the position

25    that those actions didn't constitute obstruction of justice.

```
 1                THE COURT:  We shouldn't have revoked him?
 2                MS. HUNT:  We certainly had a different view of the
 3      facts, Your Honor.
 4                THE COURT:  Oh, man.
 5                MS. HUNT:  We would never --
 6                THE COURT:  That's a good answer.  That's a very good
 7      answer.  Okay.
 8                All right.  The Government?  I think the Government
 9      has already responded.
10                MR. FENTON:  Yes, Your Honor.  We stand on our
11      submission.
12                THE COURT:  Okay.  I pretty much already ruled on
13      that one.
14                All right.  I'm going to rule on those in a little
15      bit, but give me whatever you have in addition to the letters
16      and your -- your memorandum, sentencing memorandum, everything
17      that you have.
18                You will agree to your list under this Defendant's
19      Exhibit 16, that list of restitution of $9,255.239.46 and every
20      one of those people in there, correct?
21                MS. HUNT:  Yes, Your Honor.
22                THE COURT:  You agree to that, Mr. Comu?
23                You agree that you owe that in addition to everybody
24      else that's in the conspiracy with you that -- you've been over
25      that sheet that lists that $9 million that your lawyer has
```

1    submitted to me, correct?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Okay.  All right.  So he at least owes

4    that much restitution, correct?

5              MS. HUNT:  Yes, Your Honor.

6              THE COURT:  All right.  I get it.

7              Okay.  So I'm ready to hear everything else that you

8    have in mitigation in the way of testimony.

9              I have got these letters.  I do have those.  Let me

10   make sure.

11             (Pause)

12             THE COURT:  One is from Mr. Skelton.  I even have a

13   picture of Mr. Skelton.  And one from ███████████.  Oh, no,

14   this is -- this is a negative letter.  I'm sorry.

15             And then I've got this -- that was a letter on the

16   other side.

17             Okay.  Then I've got these letters that y'all have

18   put in here from various people, a whole bunch of them, being

19   supportive.

20             (Pause)

21             THE COURT:  Okay.  All right.  I'm ready to hear

22   anything else you have in mitigation.

23             (Discussion off the record between counsel)

24             MS. HUNT:  No other --

25             THE COURT:  What, now?

```
 1              MR. HAGOOD:  I asked Ms. Hunt if there were any other
 2    objections to raise to the Court.  She said no.
 3              THE COURT:  Okay.  I will rule on those in a little
 4    bit.
 5              MR. HAGOOD:  Yes, sir.
 6              THE COURT:  Okay.
 7              MR. HAGOOD:  So we have a couple of witnesses, Judge,
 8    if it pleases the Court.
 9              THE COURT:  That would be great.  If -- let me --
10              Mr. Comu, if you will go back to where you were
11    seated over there.
12              I'm ready to hear your witnesses that you have.
13              MR. HAGOOD:  I do.  We'll call Dr. Chirase.
14              (Pause)
15              THE COURT:  Mr. Hagood, do you want him to get on the
16    witness stand, or do you just want to question them right
17    there?  That's up to you.
18              MR. HAGOOD:  If it please the Court, this is fine, if
19    that's all right with the Court.
20              THE COURT:  Sure.  It's great for me.
21              MR. HAGOOD:  Thank you, Judge.
22              Go right up here, sir.
23              THE WITNESS:  Okay.
24              THE COURT:  Let's get you sworn in, sir.
25              (The witness was sworn)
```

```
 1              THE COURT:  And you are Mr. --
 2              THE WITNESS:  Norbert Chirase.
 3              THE COURT:  Norbert Chirase?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Okay.
 6          NORBERT CHIRASE, DEFENDANT'S WITNESS, SWORN
 7                      DIRECT EXAMINATION
 8   BY MR. HAGOOD:
 9   Q.   Do you have any professional titles?
10   A.   Yes.  I have a Ph.D. in nutrition, so I'm Dr. Chirase.
11   Q.   Will you tell Judge, Doctor, your educational background
12   which qualifies you as a Ph.D.?
13   A.   Yes.  I have a first degree in biology from Portland State
14   University and a master --
15              THE COURT:  From where?  What state?
16              THE WITNESS:  Portland State.
17              THE COURT:  Portland State?
18              THE WITNESS:  Yeah.  In Portland, Oregon.
19              THE COURT:  You bet.
20              THE WITNESS:  And a master's degree in animal science
21   from Washington State.
22              THE COURT:  Okay.
23              THE WITNESS:  Which is in Pullman.
24              THE COURT:  Yes, sir.
25              THE WITNESS:  And a Ph.D. in nutrition from Texas A&M
```

```
 1   University in College Station.
 2            THE COURT:  Okay.
 3   BY MR. HAGOOD:
 4   Q.   Is Exhibit 1 your resume?
 5   A.   Yes.
 6            MR. HAGOOD:  Judge, we have given a copy to the
 7   prosecutor.
 8            THE COURT:  And you offer that into evidence?
 9            MR. HAGOOD:  I do.
10            THE COURT:  And you have no objection?
11            MR. FENTON:  No objection.
12            THE COURT:  That's admitted into evidence.
13                (Defendant's Exhibit No. 1 received)
14            MR. HAGOOD:  Thank you, Judge.
15            THE COURT:  Thank you.
16   BY MR. HAGOOD:
17   Q.   Doctor, do you know C.J. Comu?
18   A.   Yes.
19   Q.   And did you -- do you have a company in Amarillo that sold
20   product to Mr. Comu's company EarthWater?
21   A.   Yes.
22   Q.   Tell the Judge what your -- the name of your company and
23   what product you sold to EarthWater, please.
24   A.   Well, the name of my company is GTX Technologies.  I
25   founded the company in 2007 to extract minerals and use them to
```

1    supplement food and water and --

2    Q.   And why is minerals important in the humans' diet?

3    A.   Well, I did some research with beef cattle at feedlots,

4    and we found that very often when animals are under stress,

5    they lose a lot of essential minerals.  And even when they eat,

6    they could not obtain enough minerals to be able to meet their

7    bodily function.  And so they need -- there was the need to

8    supplement essential minerals.

9         So I came across this product, and I fed it to

10   animals, and I saw some responses.  They went back to feed.

11   And I found that this was very helpful not only for animals but

12   eventually for humans.

13   Q.   This product you sell, what is it, sir?

14   A.   It is called fulvic and humic acid.

15   Q.   Let me stop you.  Will you spell it for the court

16   reporter, fulvic?

17   A.   Yeah, fulvic, F-U-L-V-I-C.

18   Q.   And the other -- and the other one?

19   A.   And then -- and the other compound is H-U-M-I-C.

20   Q.   And these aren't regulated by the FDA, the Food and Drug

21   Administration, correct?

22   A.   No.  These are regulated by USDA.

23   Q.   And you've had a USDA certification?

24   A.   Yes, I do.

25   Q.   And is Exhibit 2 and 3 illustrative of that notion?

1    A.   Yes.
2              MR. HAGOOD:   We've given 2 and 3 to the Government.
3    We offer 2 and 3.
4              THE COURT:   And no objections?
5              MR. FENTON:   No objection, Your Honor.
6              THE COURT:   They're both admitted into evidence.
7                   (Defendant's Exhibit Nos. 2 and 3 received)
8              MR. HAGOOD:   Thank you, Judge.
9              THE COURT:   Thank you.
10   BY MR. HAGOOD:
11   Q.   USDA has certified your laboratory; is that correct?
12   A.   Well, they certified the products, and these are extracted
13   without chemicals, so they go under organic certification.
14   Q.   I see.  So you extract minerals from an organic
15   substance --
16   A.   Yes.
17   Q.   -- and then sell that product to companies like EarthWater
18   and other companies?
19   A.   Yes.
20   Q.   Is that correct?
21   A.   Yes.  That's correct.
22   Q.   And just for demonstrative purposes -- I won't offer them,
23   but I'm holding in my hand an EarthWater bottle of Black Water.
24   Why is this black?
25   A.   Well, it is black because one of the compounds, the humic

1    acid, is a molecule and it contains a lot of carbon.

2              THE COURT:  A lot of what?

3              THE WITNESS:  A lot of carbon.

4              MR. HAGOOD:  Carbon.

5              THE COURT:  Carbon?

6              THE WITNESS:  The element carbon, yes.

7    A.   And so the more carbon there is, the darker it becomes.

8              Now, the other compound contains the fulvic acid,

9    which is a smaller molecule.  And it has a golden color simply

10   because the concentration is not as high as this particular

11   one.

12   Q.   So the dark one, is this the humic acid?

13   A.   Yes, that's the humic acid.

14   Q.   And then the ZenFul bottle that EarthWater sold, that's

15   from the fulvic --

16   A.   The fulvic -- that's from the fulvic acid.

17   Q.   And you sell a syrup to EarthWater?

18   A.   Yes.

19   Q.   Inject it into water, and then sell it as a product to the

20   public?

21   A.   Yes.

22   Q.   And did I ask you to calculate how much product you sold

23   to EarthWater over the years that you did business with them?

24   A.   Yes.

25   Q.   Did you start doing business with EarthWater in 2014 and

1    you stopped in '19 when EarthWater was shut down by the search

2    warrant?

3    A.    Yes.

4    Q.    And does Exhibit 6 show the increase in sales over the

5    years?

6    A.    Yes, sir.

7             MR. HAGOOD:  We would offer Exhibit 6, Judge.

8             THE COURT:  Okay.

9             MR. FENTON:  No objection.

10            THE COURT:  Defendant's 6 is admitted into evidence.

11               (Defendant's Exhibit No. 6 received)

12   BY MR. HAGOOD:

13   Q.    Now, Doctor, Exhibit 6 -- I think you told me that each

14   bottle of EarthWater costs about 7 cents of humic acid or

15   fulvic acid; is that correct?

16   A.    Yes, sir.

17   Q.    And if you divided 7 cents into $173,760.00, which is the

18   total amount of product you sold to EarthWater over the four or

19   five years you did business with them, how many bottles does

20   that come to?

21   A.    It's close to 2 million.  2.5 million bottles.

22   Q.    You calculated it yesterday?

23   A.    Yes.

24   Q.    Simply divide 07 into that number, into 173, you get over

25   2 million bottles?

```
 1   A.   Yes, you get over 2 million bottles.
 2   Q.   Does Exhibit 6 show that each year your sales to
 3   EarthWater increased?
 4   A.   Yes.
 5   Q.   Except in '19 when the -- May of '19, early May of '19,
 6   when the company was shut down?
 7   A.   Yes, sir.
 8   Q.   All right.  And, finally, you export your product to other
 9   countries around the world?
10   A.   Certainly, yes, I do.
11   Q.   What other countries?
12   A.   Japan, Canada, of course, Mexico, the UK, some to
13   Switzerland and a few other countries, for example, Egypt.
14   Q.   All right.  And did you, in fact, receive an award from
15   the Secretary of Commerce for your area of exporting your
16   product around the world?
17   A.   Yes, sir.
18        And it is the President award.  The award was -- the
19   President could not present the award, so the Secretary of
20   Commerce was actually there to do it in place of the President.
21   Q.   The President at the time was President Trump?
22   A.   Yeah, President Trump.
23   Q.   And does Exhibit 4 show a press release from the Commerce
24   Department and Exhibit 5 showing you and your wife receiving
25   that award?
```

```
1    A.    Yes.
2              MR. HAGOOD:  We would offer 4 and 5, Judge.
3              MR. FENTON:  No objection.
4              THE COURT:  4 and 5, Defendant's exhibits, are
5    admitted into evidence.
6                   (Defendant's Exhibit Nos. 4 and 5 received)
7    BY MR. HAGOOD:
8    Q.    The lady in 4, who was that lady?
9    A.    Who?
10   Q.    The lady with Secretary Ross and yourself, who's the lady?
11   A.    Oh, yeah.  That's my wife, my late wife.
12   Q.    Has she passed?
13   A.    Yeah.  She passed away in 2019.
14             MR. HAGOOD:  That's all we have, Judge.
15             THE COURT:  I want to ask a couple of questions.
16             MR. HAGOOD:  Yes, sir.
17             THE COURT:  When you said you fed these to animals,
18   do you have the study, the results of the study you did and the
19   results and how they, you know, improved?  Do you have that
20   study?
21             THE WITNESS:  Yeah.
22             THE COURT:  And what kind of animals did you feed it
23   to?  Wild animals?  Domesticated animals?
24             THE WITNESS:  Well, my area was beef cattle, and this
25   was critical because we have a lot of cattle that are
```

```
 1   transported to the Texas Panhandle into the feed lots, and they
 2   are usually exposed to stress and diseases.
 3             THE COURT:  Okay.
 4             THE WITNESS:  And then not only did I feed that to
 5   cattle, but I fed that to baby pigs, pregnant pigs, and
 6   growing, you know, pigs as well.
 7             THE COURT:  Do you have a result of those studies
 8   showing how the pigs gained weight and the cows gained weight
 9   and their blood was better or whatever?  Is there some study I
10   can look at?
11             THE WITNESS:  Yes.  Yes, sir.
12             THE COURT:  Okay.  You just don't have it today?  But
13   you did do studies?
14             THE WITNESS:  Yes, we did observe some responses.
15             THE COURT:  Okay.  All right.
16             THE WITNESS:  Yes.
17             THE COURT:  The Government, questions?
18             MR. FENTON:  No, Your Honor.
19             THE COURT:  All right.  Thank you, Mr. Chirase.
20   Sorry about your wife.
21             THE WITNESS:  Thank you, Your Honor.
22             MR. HAGOOD:  Thank you.  Go ahead and have a seat.
23             (Pause)
24             MR. HAGOOD:  Call Brian Shields, Judge, if it pleases
25   you.
```

```
1              THE COURT:  Sure.
2              MR. HAGOOD:  Thank you.
3              (The witness was sworn)
4              BRIAN SHIELDS, DEFENDANT'S WITNESS, SWORN
5                       DIRECT EXAMINATION
6   BY MR. HAGOOD:
7   Q.   Will you tell the Court your name, please?
8   A.   Robert Brian Shields.
9   Q.   What do you do for a living, sir?
10  A.   I'm an attorney, sir.
11  Q.   And I'm going to just jump right to it.  In June of --
12             THE COURT:  Pull the microphone up.
13  BY MR. HAGOOD:
14  Q.   In June of 2019, you and your uncle named Jim Shields --
15  he's a lawyer; is that correct?
16  A.   Correct.
17  Q.   Your uncle Jim Shields wanted to put together a group to
18  buy EarthWater and keep it alive because you knew it had a lot
19  of product.  It was on pallets in warehouses.  And it was being
20  sold on Amazon.  And you felt that you could -- if you could
21  gain control of EarthWater, you could at least have a shot at
22  keeping the company alive and making money for investors; is
23  that true?
24  A.   That's correct.
25  Q.   Did you -- did your uncle Jim Shields put together a
```

1    group, with the assistance of the great Mike Gibson, contact

2    the Department of Justice to seek approval to try to keep

3    EarthWater alive?

4    A.    That's correct, except we didn't have the group finally

5    formed, but we had -- we tested the market, and we felt very

6    confident that we would be able to put together a group of

7    investors.

8    Q.    And then on or about June 24th or 23rd of 2019, about a

9    month after EarthWater had been shut down by the Government,

10   did you participate in a phone call to Mr. Fenton?

11   A.    Yes.

12   Q.    And did -- did the notion of trying to keep EarthWater

13   alive, was that pitched to Mr. Fenton?

14   A.    Yes.

15   Q.    And essentially were you advised that if you do this you

16   could be co-conspirators?  He didn't know what your position

17   was with them, and maybe EarthWater could be a co-conspirator?

18   Was that the response you got?

19   A.    Yes.

20   Q.    Did it have a chilling response, or was it a response that

21   said, "Yeah, we're going to move forward with this endeavor and

22   try to save EarthWater"?

23   A.    It immediately killed the deal.

24   Q.    And the next day did your uncle send Mr. Fenton an email

25   that's Exhibit 7 telling him that he was not going to move

1  forward with the idea of trying to save EarthWater?

2  A.   That's correct.

3          MR. HAGOOD:  We'll offer 7, Judge.

4          THE COURT:  All right.  Any objection to that,

5  Mr. Fenton?

6          MR. FENTON:  No, Your Honor.

7          (Defendant's Exhibit No. 7 received)

8          THE COURT:  All right.

9  BY MR. HAGOOD:

10  Q.   If Mr. Fenton said, "Look, I take no position on this,"

11  would you have moved forward?

12  A.   Yes.

13          MR. HAGOOD:  That's all I've got, Judge.

14          THE COURT:  Do you have any questions, Mr. Fenton?

15          MR. FENTON:  No, Your Honor.

16          THE COURT:  Okay.  Thank you, sir.

17          THE WITNESS:  Thank you, Judge.

18          (Pause)

19          MR. HAGOOD:  Judge, we would also offer -- I believe

20  it's in the sentencing memorandum, but we also offer the sworn

21  declaration of Stephen Lloyd and the sworn declaration of John

22  Skelton.

23          The upshot of Mr. Lloyd is he's known Mr. Comu for

24  years.  Mr. Lloyd has a very successful business, which applies

25  marble to commercial structures.  And he says in his

```
 1    declaration he would offer Mr. Comu a job to help him make
 2    restitution.  That's how much confidence he has in him.
 3            Mr. Skelton has written letters to the Court but also
 4    was an investor.
 5            Both Mr. Lloyd and Mr. Skelton were investors.  They
 6    knew they could lose money.  Mr. Skelton invested $50,000.00.
 7    Mr. Lloyd invested 10.
 8            They all signed subscription agreements.  They all
 9    knew they could lose their money.
10            And they are here to support Mr. Comu, Your Honor.
11            THE COURT:  And you offer those?
12            MR. HAGOOD:  I do, Your Honor.
13            THE COURT:  Objection?
14            MR. FENTON:  No objection.
15            THE COURT:  Then 8 and 9 -- is that what those were?
16            MS. HUNT:  Yes.
17            MR. HAGOOD:  I think so.
18            MS. HUNT:  Yes.
19            THE COURT:  I think it was 8 and 9.
20            MR. HAGOOD:  Yes, Judge.
21            THE COURT:  8 and 9, they are admitted into evidence.
22                (Defendant's Exhibit Nos. 8 and 9 received)
23            THE COURT:  Okay.  What else?
24            MR. HAGOOD:  I think Mr. Poe has got some remarks to
25    make, Judge, in point of a variance.
```

```
 1              THE COURT:  Great.  Great.
 2              MR. POE:  Your Honor, just for housekeeping stuff, I
 3    do have several exhibits that I've provided to the Government.
 4    It's Defendant's Exhibits 10 through 15 that I would offer at
 5    this time.
 6              THE COURT:  Great.
 7              Any objection to those?
 8              MR. FENTON:  No, Your Honor.
 9              THE COURT:  They're all admitted into evidence.
10              (Defendant's Exhibit Nos. 10-15 received)
11              MR. POE:  Your Honor, and just -- really just to kind
12    of sum all this up and just to kind of land the plane here on
13    this case -- it feels like it's going on for years now -- I
14    just -- I would draw the Court to -- or the attention of the
15    Court that Mr. Comu -- just kind of giving you an idea of who
16    he is.
17              You know, he was raised -- he was born in Turkey.  He
18    was raised in a home where his father was rather abusive, both
19    verbally and physically.
20              He's the youngest of three siblings, two of which --
21    the older two have been very successful in their lives and
22    their career, but Mr. Comu struggled.  He struggled
23    academically.  He struggled athletically.  And a result, his
24    father just didn't really seem to be proud of him.  He would
25    use words like he was never going to amount to anything, he's
```

1      always going to be nothing.  And at the age of 15 and 16, he
2      kind just of disowned him.
3              And so that kind of has a chilling effect in how you
4      perceive life whenever your own father treats you that way.
5      And so Mr. Comu's mission at that point was to try to, what I
6      think most people would do, is I'm going to try to prove him
7      wrong.
8              Unfortunately, he just didn't have the tools to be
9      able to do that.  And so you get into a series of adventures.
10     And he has this entrepreneurial spirit just like his father
11     had.  But in trying to be an entrepreneur -- and he did what
12     all of us do to some form or fashion in our life is you fake it
13     until you make it, right?
14             But, unfortunately, the choices that he made along
15     the line it led him to where he's got an injunction from the
16     Securities Board in Wisconsin.  He's got an injunction from the
17     SEC.
18             And then he goes through a really nasty bankruptcy
19     that's very public, all of which is -- it's preventing him from
20     being where he wants to be, which is just proving that he is
21     somebody, that he is a person worthy of stature in society, not
22     that he's trying to, you know, make it rich and to live this
23     high, affluent lifestyle.  It's just -- it's just to have this
24     stature to disprove what his father had told him when he was a
25     young kid.

1              And so he's always looking for his big break.  And in

2     the course of that bankruptcy, he comes across this idea of

3     Black Water, right?  It's infused with these minerals that can

4     help you.

5              And you look around in the news, and there's all

6     these beverage companies that are starting, and it reminds me

7     of the dot-com age, right?  Where these people would start

8     these companies that had massive losses, but they had a

9     concept.  They had a brand, right?  And then they take that

10    brand and it either becomes an IPO where it's an initial public

11    offering and everybody becomes wealthy out of it, or it gets

12    sold to somebody else.  Mark Cuban did the same thing.  He

13    became a billionaire doing that at Broadcast.com.  Not that it

14    has any profit.  And the beverage industry is the same way.

15             You take this -- the product, you build a brand for

16    it.  You might have a very small distribution network, but it

17    requires capital.  And the idea is, is can I get a company like

18    Coke, can I get a company like Dr Pepper interested in it?

19    Because they've got the infrastructure.  They've got the

20    ability to scale this out all across the world and make

21    billions of dollars on it.  He had a concept, but, again, he

22    needed the capital.

23             And so first he starts off raising it from his

24    friends and his family and -- but it's not enough.  It's not

25    enough to be able to get the celebrity endorsements that he

1   got.  It's not enough to be able to get the NASCAR that's got

2   EarthWater all over on the side of it or the radio spots and to

3   get it on Amazon and get into Central Market.

4           And so he starts looking for institutional investors.

5   The problem is he's got these issues from the past, right?

6   He's going through the middle of a bankruptcy.  The only way to

7   get this idea afloat is to bring in, unfortunately, people like

8   Kadish and Green that are going to charge him 40 to 50 percent

9   in order to find these investors.

10          He wasn't targeting elderly folks.  I mean, the

11  Government wants to say that this is -- it's specifically

12  targeting these vulnerable victims.  He was wanting investors,

13  investors that he was hopefully going to make rich one day with

14  this idea, with this product.

15          And, you know, it wasn't enough -- so first you go

16  through one round with Kadish and Green, and then he goes and

17  he finds an investment banker called Midtown Partners.  He

18  starts to go through that.  He thinks he's got it.  He thinks

19  he's got his funding at this point to be able to do the IPO,

20  and that falls through.  So now he has to go through another

21  round with Kadish and Green, and the cycle continues until he

22  literally signs an agreement with this investment bank in New

23  York City called Maxim.  And he's getting off the plane or

24  getting on the plane, and he gets arrested on this indictment.

25          Now, I realize that Maxim has now later said, "Well,

1   if we had known this, we never would have entered into this

2   agreement.  If we would have known this, we wouldn't have

3   entered into this agreement with him."

4        But the fact of the matter is, if C.J. Comu was

5   trying to defraud investors and was just using this as a

6   personal bank, why is he even seeking out these institutional

7   guys?  Why is he putting his neck out on the line?  Because

8   they very could easily turn and report him to the SEC or to the

9   DOJ if they thought fraud was going on.  Why would he do that

10   if he believed that he was running a massive scheme to defraud

11   somebody?  And, of course, he didn't.

12        In fact, he believed in this product.  Yes, did he do

13   some hard sales with people?  Yes, because he believed in the

14   product.  And the fact of the matter is, of all the things that

15   the Government has said that he's lied about, not once have

16   they alleged that he was lying about the financials of the

17   company as far as the sales go.  There's hundreds of thousands

18   of dollars' worth of sales.

19        Not once -- I mean, they try to take this sideswipe

20   at him and say this product was just a prop, but the fact of

21   the matter is, it was sold in Central Market.  There is Amazon

22   sales to the tune of 3- or $400,000.00.  You have investors in

23   their own reports whenever they sent it to Probation saying,

24   "Yeah, I saw it in the store, so I knew this was a legitimate

25   product."

1          And so this was not this idea that he was just trying

2     to, lack of a better -- screw these old folks out of their

3     money.

4          And so he gets in -- he's arrested or -- and then he

5     gets out on pretrial release, and he has this idea of "I

6     still -- this is such a great product here that has value not

7     only for myself but for these investors and these

8     shareholders," and he tries to get the Shields group to buy it.

9     Because what didn't come out, and it's in a transcript, is Jim

10    Shields was a big advocate for the product.  He drank it all

11    the time.  And so they wanted to buy it knowing the allegations

12    that were going on, but they were stopped by the Government.

13         The Government didn't try to seek out to get a

14    trustee to come in to help save this company.  There's pallets

15    of this stuff that, you know, went bad, got spoiled because of

16    the fact it expired in the warehouse.  They didn't do anything

17    to try to mitigate the losses to the victims, but yet they want

18    to, you know, keep raising the number, moving the goalpost

19    every time, you know, the PSR wants to come out with something

20    new.

21         And so he gets thrown in jail because of the

22    violation of his pretrial release.  And his -- kind of his run

23    through the system in the last three years is kind of

24    noteworthy.  Like, he -- he showed up at the revocation hearing

25    with a patch over his eye because he just had surgery to have

1    his detached retina corrected.  Unfortunately, he wasn't able

2    to go to any of the follow-up visits.  Unfortunately, the

3    system did not give him his eyedrops.  So ultimately he's lost

4    the sight in his eye and he's not able to see.

5            And he also -- ironically, he was one of the first

6    five people in Dallas County in the jail to get COVID when

7    COVID came out.  And back when no one really knew what COVID

8    was and it was kind of treated like it was the plague, they

9    took the five guys, thew them in a cell, and tossed some

10   Tylenol in there through the slot and just hoped that they

11   fended for themselves and it kind of went away.  And just the

12   idea of "what was going to happen to me?  Am I going to die

13   here in the dark?" was kind of traumatic for him.

14           But as -- COVID continued to, you know, hurt him,

15   because he has been sitting here waiting to be sentenced for

16   years now to the point that he's lost about 9 to 15 months'

17   worth of time that he have could have gotten for taking

18   programs with the First Step Act credit.  And so he's continued

19   to be punished with it.

20           So the question now is, how do you treat this

21   62-year-old man who, you know, is here and has pled guilty to

22   23 counts of, essentially, fraud?

23           And so I gave you those press releases.  And I

24   just -- these are press releases that I've gone back -- and I

25   looked through every single press release that the U.S.

1    Attorney's Office in the Northern District has done in the last

2    six years, and I found cases that were related to securities

3    fraud victims.  I excluded all the healthcare fraud.  I

4    excluded that stuff.

5            So here are the ones that were relevant.

6            Here you've got Exhibit Number 10.  You've got James

7    VanBlaricum, B -- or V-A-N-B-L-A-R-I-C-U -- C-U-M.

8            In 2017, Judge Means sentenced him to 84 months for a

9    $32 million oil and gas Ponzi scheme.  He was 78 years old at

10   the time.

11           Exhibit Number 11 deals with Carl Battie,

12   B-A-T-T-I-E.  He was 60 years old in 2016.  And Judge Fitzwater

13   sentenced him to 120 months for $11.4 million fraud that is

14   titled "A Real Estate Investment Scheme Targeting Senior

15   Citizens."

16           Exhibit 12 discusses Chris Faulkner.  He was 40 years

17   old at the time.  I personally know about this one.  It was a

18   $150 million oil and gas scheme that he ultimately -- the

19   Government wanted to do an 11(c)(1)(C) plea to 12 years on.

20   Judge Boyle rejected it, and they came back and did a (C) plea

21   to 180 months.  That was in '21.

22           And then Exhibit Number 13 deals with Bruce Bise,

23   B-I-S-E, and Samuel Mendez, M-E-N-D-E-Z.  Bise was 60 and

24   Mendez is 65.  They ran a cryptocurrency business where they

25   raised $24 million from 13,000 investors.  And the press

1   release says that they just used the money all for their

2   personal expenses.  Ultimately, the Government let them plead

3   to tax charges because they didn't report the $4 and a half

4   million dollars over the two years that they had just put in

5   their pockets.  And they each got 50 months.

6            You've got Exhibit Number 14 deals with Wendy Richie.

7   She was 59.  And Jeffrey Richie, 55.  Husband and wife.  They

8   served as a third-party administrator for dozens of pension and

9   retirement funds.  They literally submitted over 90

10  distribution sheets for different retirees, asking for funds to

11  be pulled out of their accounts to the tune of $15.2 million

12  and just pocketed it, didn't tell them anything, just stole

13  their IDs and just took the money out of their retirement

14  accounts.

15           Judge Lindsay gave -- the Government allowed them to

16  plea to charges where it capped them at 12 years and 10 years

17  respectively.  Judge Lindsay in 2020 gave them nine and eight

18  years.

19           And then the last one is Exhibit Number 15, deals

20  with Patrick Howard.  In '21, Judge Boyle sentenced this Ponzi

21  schemer who had raised $13 million from a hundred investors

22  where he promised 12 percent returns, issued phony account

23  statements.  He assured investors that they could not under any

24  circumstances lose their investment because he had insurance to

25  offset the poor performance of his funds and his investments.

1          And they had victims testifying at sentencing, and he

2    got 60 months.

3          So you look at those cases and you look at EarthWater

4    in which you have a real product.  You've got real potential.

5    You've got a defendant who is working to make this case a

6    success, whether -- he did not do things right.  That's why

7    we're here.  I'm not arguing about that.  But he just -- he was

8    not pitching this as a product to try to just get their money

9    to go pocket it.  He was pitching it to keep this company

10   afloat so that he could get it to the end game.

11         And whenever you look at all of this -- and this is a

12   less egregious set of circumstances than these other cases.

13   And that's why we believe from our sentencing memorandum that

14   a sentence in that five- to seven-year range is appropriate

15   here.

16         THE COURT:  Thank you.

17         MR. HAGOOD:  Judge, one other thing, if I could.  I

18   wanted to just introduce you to the people that came to support

19   Mr. Comu.

20         THE COURT:  Oh, that would be great.  Thank you.

21         MR. HAGOOD:  Would you stand up, please?

22         And if you don't mind, would you tell -- just

23   starting on the right, Ms. Lloyd.  Would you tell the Judge

24   your name?

25         MS. LLOYD:  My name is Jan Perry Lloyd.

```
 1              THE REPORTER:  I'm sorry?
 2              MS. LLOYD:  Jan Perry Lloyd.
 3              MR. LLOYD:  Stephen Lloyd.
 4              MR. HAGOOD:  And you submitted a written affidavit,
 5  right, sir?
 6              MR. LLOYD:  I did.
 7              MR. HAGOOD:  Ma'am?
 8              MS. GREENBURG:  Kristin Greenburg.
 9              MS. WHALEN:  Andrea Whalen.
10              THE REPORTER:  I'm sorry?
11              MS. WHALEN:  Andrea Whalen.
12              MS. WOOD:  Mindy Wood.
13              MR. SKELTON:  John Skelton.
14              MR. HAGOOD:  Mr. Skelton, you submitted a
15  declaration -- you submitted a declaration also, didn't you,
16  sir?
17              MR. SKELTON:  Yes, sir.
18              MRS. COMU:  Phyllis Comu, his wife.
19              THE REPORTER:  Judge, I didn't get that.
20              THE COURT:  You're his wife?
21              MS. POE:  Phyllis Comu.
22              MRS. COMU:  Yes.
23              MR. HAGOOD:  Behind you?
24              NEAL:  I'm Phyllis's brother, Neal (inaudible)
25              MR. HAGOOD:  Sir?
```

```
 1              MR. JACOBI:  Robert Jacobi.

 2              MR. HAGOOD:  Thank you, sir.

 3              I know you, Doctor.

 4              DR. CHIRASE:  Yeah.  Norbert Chirase.

 5              MR. HAGOOD:  Right.  Thank you, sir.

 6              I just wanted the Court to see the number of people

 7   here.

 8              Thank you very much.  Have a seat.

 9              MR. POE:  The only thing left, Your Honor, I would

10   have is just Mr. Comu's allocution.

11              THE COURT:  Okay.

12              MR. POE:  So do you want to do that now, or would you

13   like to --

14              THE COURT:  Do you want to do it now or after you

15   hear from the Government?

16              MR. POE:  It's your call, Your Honor.  It's your

17   show.

18              THE COURT:  Yeah, I understand, but I'm giving you

19   some latitude, whichever you would rather.  I don't care.

20              MR. POE:  I would rather hear him now, Your Honor.

21              THE COURT:  Okay.  Good.

22              Mr. Comu you don't have to say anything, but if you

23   would like to, now is your chance, okay?

24              (Pause)

25              THE COURT:  Mr. Comu, it's okay for you to be upset.
```

1    This is your day.  This is your opportunity.  And I just -- I

2    want you to get ahold of yourself so I can hear whatever you

3    would like for me to hear, okay?

4              And, you know, it should be upsetting.  I mean,

5    this -- Federal court is a difficult place to be.

6              THE DEFENDANT:  Honorable Judge Kinkeade, I stand

7    before you and God to repent for my sins.  What began as a

8    dream to build a global health company turned into my worst

9    nightmare.

10             My life, along with the lives of hundreds of others

11   that believed in this, have been devastated financially and

12   emotionally from this loss.  This was never my intent.  My

13   business was something I gave my life to and net worth, and now

14   it's all gone.

15             EarthWater was not just a company, it was my only

16   child.  I dedicated my life to its success and sacrificed

17   everything I had to accomplish it.

18             I was born in Turkey, arrived in Canada as a small

19   child with my older brother and sister.  My father was a

20   professional engineer and a strict disciplinarian.

21             In spite of tough times growing up and many

22   challenges, I was always told to do the right thing in life.  I

23   feel I failed.

24             During my pretrial, I tried to save my company.  I

25   could not watch it die.  This attempt cost me my liberty.

1          Every morning when I wake up and every night when I

2     try to sleep, I ask a simple question.  Why?  Why did

3     EarthWater have to die for my sins?

4          Today I am a broken, humiliated, and destroyed

5     62-year-old man.

6          I've been held in five different jails since November

7     of 2019, been threatened, bullied, possessions stolen by

8     inmates.  My own wife of over 22 years has been the recipient

9     of death threats for no reason except she's my wife.

10         If I could rewind this nightmare, I would never allow

11    for the mistakes that I made.  If I can make every shareholder

12    whole again, I would do all I could now or in the future to do

13    so.

14         In closing, there are no words to express how sorry I

15    am for the pain and suffering caused by all those associated

16    with me.  I've cried an ocean of tears.  I have nothing left.

17         I thank you for the opportunity to address you and

18    this Court.

19              THE COURT:  Thank you.

20              All right.  Government?

21              MR. FENTON:  Yes, Your Honor.

22         We have one victim, Mr. ███████, who we would

23    like the Court to hear from.

24              THE COURT:  I would love to hear from him.

25              (Pause)

```
 1              THE COURT:  Do you want to move those two bottles?
 2   Or you can leave them there.  Whatever.  I don't care.
 3              (Pause)
 4              THE COURT:  Hi, Mr. ████.  Come on up to the podium,
 5   please, sir.  And let's get you sworn in.
 6              Raise your right hand, please, sir.
 7              (The witness was sworn)
 8              THE COURT:  Go ahead.
 9              ████████, GOVERNMENT'S WITNESS, SWORN
10                       DIRECT EXAMINATION
11   BY MR. FENTON:
12   Q.   Mr. ████, can you please state your name and spell it for
13   the record?
14   A.   ████████████████.
15   Q.   And, sir, where do you live, and what do you do?
16   A.   I live in San Diego, California, and I work for Hilton
17   Corporation.
18   Q.   And, sir, you were an investor in EarthWater, right?  You
19   bought EarthWater stock?
20   A.   Yes, sir.
21   Q.   Okay.  Can you describe for the Court, for Judge Kinkeade,
22   how you first learned about EarthWater and how it was that you
23   came to buy EarthWater stock?
24   A.   I learned of EarthWater through a family friend.  And I
25   was actually introduced to C.J. over the phone shortly after my
```

1    wife of 18 years passed away at 47 years old.

2              And she had invested in EarthWater and thought that

3    it would be something that I might be interested in, so I said

4    have him call me.

5              So C.J. gives me a call and tells me all about

6    EarthWater being the new oil and --

7              THE COURT:  When you say C.J., Mr. Comu?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Okay.

10   A.   How this is an investment that will assure the financial

11   stability of not only myself but my children and my

12   grandchildren especially when the company goes public.

13             And he said, "If you would just invest a certain sum

14   of money, I will send you a certificate of 100,000 shares with

15   EarthWater.  And when it goes public, that's what we're all

16   waiting for."

17             And there is one thing about that conversation that

18   I'll never forget.  He said, "███████, when we're done here, I

19   want you to look up to God, and I want you tell ███████ that

20   you took care of them, that you did something today that will

21   assure the economic stability of not only, again, yourself but

22   your grandkids and your own children."

23             That's exactly what I did.

24             THE COURT:  How much money?

25             THE WITNESS:  I gave him $25,000.00.

1          THE COURT:  Okay.

2   A.    And then as time went by, I received several videos and

3   emails from Mr. Comu.  One was of a huge factory where there

4   were pallets after pallets loading up this black EarthWater

5   that, again, is going to be the new oil.  And I thought, okay,

6   well, you know, things are happening.  This is good.

7          Then I remember one time he called me up, and he

8   goes, "I'm going on a show much like the Shark Tank."  And he

9   goes, "Keep an eye on that one, because if we get an investor

10  involved from these people here, your stocks will just shoot

11  through the roof."

12         And not one thought that it was a good idea.

13         That kind of started me thinking, well, maybe I

14  wasn't thinking so clearly in my grief.

15         And then I get a call from C.J. saying, "We're going

16  public.  We're going public first quarter of next year."  And

17  he goes, "Hang onto your hats, because this is when it is all

18  going to begin."

19         A month went by, I believe, and then I get a call

20  from another representative from EarthWater calling me up to

21  tell me that everything is okay with my account, all my stocks

22  are secure, but he had some unfortunate news for me, that

23  another investor in EarthWater had just lost his wife in a

24  severe car accident and both of their children were in a coma

25  in the hospital.  "And when that happened to him, we thought of

1  you, ████, because if there's anyone out there that

2  understands exactly what this man is going through, you might

3  be able to help him out.  See, we are selling his shares now at

4  a severe discount, much less than what he had paid for them,

5  somewhere around where you paid.  So if you would just simply

6  invest another $25,000.00, we'll give you another 100,000

7  shares.  And in a couple of months when this thing goes big and

8  it takes off, you will never have to worry about money again."

9          And I thought I was taking care of my children.  They

10  had just lost their mother.  And then it never went public

11  and --

12          THE COURT:  So you gave him another 25?

13          THE WITNESS:  Yes, sir.

14          Ask that question again?  I'm sorry.

15          THE COURT:  You gave them another --

16          THE WITNESS:  No, sir.  No.  I actually was much more

17  clear-minded at that point.

18          THE COURT:  So you never put more than --

19          THE WITNESS:  That was it.  Something inside me said

20  no, don't do this.  If this thing is going to go public like

21  everyone has promised in the next 90 days, I'll be able to help

22  him.

23          THE COURT:  So you never put another 25 --

24          THE WITNESS:  No, sir.

25          THE COURT:  -- or another dime in it?

1              THE WITNESS:  No, sir.

2              THE COURT:  Okay.

3              THE WITNESS:  It was the initial investment.

4              THE COURT:  Okay.  You just wanted me to know how

5     they were trying to get another 25 out of you?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  Okay.  I get it.

8     BY MR. FENTON:

9     Q.   And, Mr. ▮▮▮▮▮, can I ask you, was there a time when you

10    reached out to Mr. Comu to ask him about the status of the IPO

11    that he had been talking about?

12    A.   Yes.  As a matter of fact, when I heard that they were

13    trying to sell this person's shares, I thought, well, since

14    they're worth a lot more now than when I had purchased them,

15    that maybe I could sell a few.

16              And when I called C.J. to tell him that that's what I

17    was thinking about doing, he was livid.  He was just, "Don't

18    you do that," you know.  I mean, he was just -- he came off at

19    me like it was severe.  So I just laid low, and I just -- he

20    goes, "Just be patient.  It's going to happen."

21              That's -- and then obviously nothing ever went

22    public.

23    Q.   And did you have any other conversations with Mr. Comu,

24    any conversations that ended with him hanging up on you?

25    A.   Well, that was one that he hung up on me.  I can't

```
 1  remember any additional.
 2  Q.   Okay.
 3            THE COURT:  I'm sorry you lost your money.
 4            THE WITNESS:  Me, too.
 5            THE COURT:  I'm sorry more you lost your wife.
 6            THE WITNESS:  Yes, sir.  You know, there is some --
 7            THE COURT:  I get it.
 8            THE WITNESS:  -- cuts in life that you get --
 9            THE COURT:  I get it.
10            THE WITNESS:  -- that will heal with a scar.
11            THE COURT:  I get it.
12            THE WITNESS:  But underneath maybe not so much.
13            THE COURT:  My brother lost his wife a couple of
14  years ago, and it's really, you know -- watching him go through
15  that, really, really, really hard.  And I'm so sorry.
16            THE WITNESS:  Thank you.
17            THE COURT:  Young man -- she was a young woman to
18  have lost her.
19            THE WITNESS:  Yes, sir.
20            THE COURT:  So I can't fix any of this, really.
21            THE WITNESS:  I know.
22            THE COURT:  But I'm happy to hear you, and I'm sorry
23  that you had to travel all this way and be taken advantage of,
24  okay?
25            THE WITNESS:  Yes, sir.
```

```
 1                THE COURT:  Take care of those kids.
 2                THE WITNESS:  All the time.
 3                THE COURT:  That's something good.
 4                THE WITNESS:  The best I can.
 5                THE COURT:  That's something good to invest in.
 6                THE WITNESS:  I've got two grandkids now.
 7                THE COURT:  Oh, well, there you go.  That's great.
 8                THE WITNESS:  Yeah.
 9                THE COURT:  Yeah.
10                Thank you, sir, for being here.
11                THE WITNESS:  Absolutely.
12                THE COURT:  All right.  Do you have any questions,
13      defense?
14                MR. POE:  No, Your Honor.
15                THE COURT:  All right.  Thank you for being here,
16      sir.
17                (Pause)
18                THE COURT:  All right.  Mr. Fenton?
19                MR. FENTON:  Your Honor, would this be an appropriate
20      time to speak on the sentence?
21                THE COURT:  Yes.
22                MR. FENTON:  Okay.
23                THE COURT:  I have a question.  So y'all are really
24      after these people for the 10 percent lie, correct?  That's
25      what all this is about, is what they lied about on how much
```

```
 1    they were going to pay people and it was just a flat-out just
 2    big-time lie?
 3            You don't -- you're not taking the position formally
 4    about whether the product was quality or not.  Yes or no?
 5            MR. FENTON:  That -- that's correct, Your Honor.
 6            THE COURT:  Okay.
 7            MR. FENTON:  That's correct.
 8            THE COURT:  All right.  Then let's concentrate on
 9    what that is, which is telling the big lie and where we are
10    with regard to that.  I understand that issue and how that
11    played into this.
12            Why didn't you let them try to sell it?
13            MR. FENTON:  Your Honor, the fraud -- the company was
14    infected by the fraud.
15            THE COURT:  The bottles weren't infected.
16            MR. FENTON:  Right.  The bottles were not infected.
17    The efforts -- the subsequent efforts to sell the company were
18    in violation of Mr. Comu's conditions of release.  He was not
19    supposed to go --
20            THE COURT:  Yeah, I agree with that.
21            MR. FENTON:  -- and do that, Your Honor.  And --
22            THE COURT:  But let's assume you came to me and you
23    said, "Judge, how about you appoint a receiver?"  Could we have
24    cleaned this thing up and had a receiver try to sell it or do
25    something with it?  I'm just -- could have tried to get some of
```

 1    these people their money, some of the money, anyway, or, you

 2    know, whatever if this was something real.

 3              I'm not sure I'm ever going to drink anything that's

 4    got black in it.  I don't care how good it is or whether

 5    Shaquille O'Neal or anybody else tells me I ought to drink it.

 6    I don't think I could -- I don't think I can do it, but

 7    apparently other people can.

 8              And I just don't -- I don't understand that when the

 9    Government takes such a hard line when, you know, I've seen

10    these things in the past and we -- I just get a receiver in

11    here and we start scrambling around.

12              Actually, I think Mr. Comu should have gotten his

13    lawyers to do that, say, "Hey, let's get a receiver appointed.

14    I'm not the guy."  You know, certainly he wasn't the one to be

15    getting the money, and he wasn't the one to be doing the

16    selling.  I get all that, and I get your point about infected.

17              But if we had to do it over, couldn't we have done

18    something like that?

19              MR. FENTON:  Your Honor, the fraud took place at the

20    time when Mr. Comu took their money, because -- took the

21    victims' money, because the fraud was about how he would use

22    that money.

23              And the Government's position is that Mr. Comu and

24    his co-conspirators were using the money, an overwhelming

25    majority of the money, for their own personal benefit.

1              THE COURT:  I get that.

2              MR. FENTON:  While they -- while it is true that they

3     were bottling some product --

4              THE COURT:  What if they had been doing Cadillacs?

5     We wouldn't have just thrown them away.  We would have sold

6     them, wouldn't we?

7              MR. FENTON:  But the bottled water was just being

8     used as props.  There was not -- as far as the Government could

9     tell in the course of its investigation --

10             THE COURT:  You're not prosecuting them for bad

11    water.  That's different.  You tell me you're doing that,

12    that's different.  If this was not a real product, didn't do

13    real stuff -- Dr. Chirase says it did.  But you're not taking

14    that position.  That's my struggle with this, is that, you

15    know, Government, "Oh, it was just a prop."  But you didn't

16    indict them for that.  We didn't try them for that.  And he

17    hasn't been in jail for three years for that.

18             MR. FENTON:  No.  We tried him for taking people's

19    money and just putting it directly into his pocket.

20             THE COURT:  Yeah, and I'm going to punish him for

21    that.  I don't have any trouble.  I just don't understand why

22    we didn't try to get some of these people's money back.  That's

23    just -- I've never been a prosecutor.  You have a hard job.

24    I'm not trying to second-guess you.  I'm really not.  And I'm

25    not trying to whack you because you're a Washington lawyer.

1    I'm not.  I promise.

2            There are -- I'm sure you're one of the good ones.

3    I've got -- I was going to have a bunch of them in here

4    tomorrow on kind of an odd deal.  But, anyway -- a DOJ, he's

5    got COVID and can't come now.

6            But help me understand that if you were in my shoes.

7            MR. FENTON:  Yes, Your Honor.

8            THE COURT:  Go ahead.

9            MR. FENTON:  The CEO, the COO, the CFO, all the

10   people who were selling the stock, all of these people were

11   indicted for fraud.  This was essentially a fraudulent stock

12   sale operation.  And at the center of this fraudulent stock

13   sale operation was an individual, Mr. Comu, who for 30 years

14   had a history of fraud and concealed that fraud.  He used

15   victim money to conceal that fraud from everybody, including

16   the people who he subsequently tried to do business with after

17   he was indicted.

18           Mr. Jenson, the individual, the elderly gentleman who

19   he had called on the phone to try to get $500,000.00 and hide

20   it from the Government.

21           The Shields group, who he owed money to.  And if you

22   look at the term sheet that the Shields group had negotiated,

23   what they were going to do was sell more stock to these poor

24   people who had already been victimized, and they were going to

25   make arrangements for the payment of past-due invoices for

```
 1    legal services that the Shields group had provided to Mr. Comu
 2    and that Mr. Comu had not paid.
 3              When we spoke to Nick Mysore, the second individual
 4    who Mr. Comu tried to do the deal with, he had no idea about
 5    all -- about Mr. Comu's background --
 6              THE COURT:  All the shenanigans?
 7              MR. FENTON:  -- the bankruptcies --
 8              THE COURT:  I get it.
 9              MR. FENTON:  -- about the fraud, you know, and all
10    this other stuff.  All of these deals that were going to happen
11    were all premised on frauds.
12              And the thing that's really important to remember is
13    the product itself is not the value here.  The value that
14    Mr. Comu is selling, if you listen to the testimony from all of
15    the victims and the victim impact statements -- when you heard
16    from Mr. ██████ and other folks, it is the promise of the IPO.
17    It's the promise of the buyout from Amazon, from Coca-Cola,
18    from these other companies.  That's the payout.  That's the
19    high rate of return.
20              The bottles, the reason the Government is not
21    acting -- we don't advise on buying and selling companies.  We
22    don't advise on safety, whether or not this is a safe product
23    or not.  But at its heart, what Mr. Comu was selling was not
24    that water, it was the promise of the IPO, the promise of the
25    future acquisition.
```

1                    The reason --

2                    THE COURT:  You made a decision it was worthless.

3                    MR. FENTON:  We -- but we didn't make that decision.

4                    THE COURT:  Yeah, you did.  You didn't -- you didn't

5    ask me to have a receiver.  You made a decision that stuff in

6    those bottles didn't have enough value separate from this lie

7    about IPO and all that stuff, pure bunk, that I could have

8    appointed a receiver, some sharp guy like you that could have

9    handled that and maybe sold the stuff for a million bucks or

10   $500,000.00 or something.

11                   I mean, you just -- you got -- I don't know.  I don't

12   understand.  You tell me you never get receivers appointed in

13   these kind of cases?

14                   MR. FENTON:  In some cases decisions are made to

15   appoint receivers.  That's true.  But other steps could have

16   been taken as well.  For example, they could have petitioned

17   for bankruptcy under Chapter 7 or Chapter 11.  None of that

18   action was taken, and it's because at the end of the day this

19   was just a fraudulent stock sale operation.  Yes, they bottled

20   some water.  But part of the reason why they didn't have this

21   big legitimate ongoing operation is because they didn't use the

22   money --

23                   THE COURT:  If you thought it had any value, you

24   would have done that, wouldn't you?

25                   MR. FENTON:  That could have been something that

```
 1   could have been discussed.
 2             THE COURT:  I didn't ask that.  Answer it the way I
 3   asked is.  What did I ask?
 4             If it had had a bunch of value, you would have
 5   thought in your own mind, "Hey, Judge, I would very likely have
 6   asked for a receivership of some sort."
 7             MR. FENTON:  Yes, Your Honor.  That's a possibility.
 8             THE COURT:  That's a coulda, woulda, shoulda answer.
 9   That's not an answer.
10             Wouldn't you have done that?
11             MR. FENTON:  Yes, Your Honor.
12             THE COURT:  Okay.  I'm not -- I'm not trying to trap
13   you.  I'm just trying to say -- I'm as upset with these people
14   as you are.  I'm not a prosecutor.  But I just, you know -- I
15   don't understand.
16             I think if I had known, I would have done it on my
17   own.  I mean, I would have brought you in here and said,
18   "Mr. Fenton, why don't we get a receiver here?" and you could
19   have made these arguments.  I might have been convinced,
20   "Judge, this doesn't have enough value.  We won't get enough
21   out of this."
22             I think maybe I -- you -- I might have bought your
23   argument.  But, anyway, enough about that.
24             You want me to give this guy a sentence between --
25   I've got your memo here.  You don't want me to give him the 440
```

1    years that the guidelines say, correct?

2            MR. FENTON:  No, Your Honor.  No, the Government is

3    asking for a sentence -- the guidelines range is life.  The

4    Government is asking for a sentence of 15 to 17 years.  180 to

5    204 months.

6            THE COURT:  I've got the statute, zero to 20; is that

7    right?

8            MR. FENTON:  That's correct.

9            THE COURT:  Counts One to Twenty-One?

10           MR. FENTON:  That's correct.

11           THE COURT:  So I can't give him more than that.

12           MR. FENTON:  That's right.  And the Government is not

13   asking for that.  The Government is asking for --

14           THE COURT:  Well, it wouldn't matter if you did.

15           MR. FENTON:  Right.

16           THE COURT:  I don't think I can -- I don't think I

17   can do it.

18           Okay.  I get it.

19           All right.  And what do you want me to do again?

20   Let's go over it one more time.

21           MR. FENTON:  The Government is asking for a sentence

22   somewhere between 15 and 17 years.

23           THE COURT:  And they're asking me to give him --

24           MR. POE:  Five to seven.

25           THE COURT:  Okay.

1          MR. FENTON:  And as the Court knows, Your Honor has

2    already sentenced three defendants in this case.

3          THE COURT:  I sure have.

4          MR. FENTON:  Two of whom to six years and one to two

5    years.

6          THE COURT:  Oh, that's right.  Okay.

7          MR. FENTON:  And the one final point I just want

8    to -- I would like to raise with the Court is that, you know,

9    the Government believes that this is a truly remarkable case in

10   a couple of different ways, one of which is Mr. Comu's lengthy

11   history of committing fraud.  The second is the cruelty with

12   which he treated the victims.  And then the third is really

13   with respect to the relentless efforts to continue the fraud

14   after he was indicted.

15         And I think that it's rare that you see a case where

16   you have a defendant giving you a candid insight to their

17   approach, not only to the world but specifically to pleading

18   guilty for a fraud just like this.

19         And the Government --

20         THE COURT:  And keep doing it after -- and, you

21   know -- even while you're out there free, running around?

22   Granted, you're on pretrial release.

23         MR. FENTON:  Or even when you're in jail on a

24   recorded line --

25         THE COURT:  Even in jail.

```
 1                    MR. FENTON:  -- you know is recorded.
 2                    THE COURT:  Yeah, that's true.
 3                    MR. FENTON:  But the Government provided Your Honor
 4     Exhibit 4, which was a recorded telephone conversation between
 5     Mr. Comu and Mr. Fleming where Mr. Fleming and a co-conspirator
 6     talked about the fact that he had recently pled guilty in a
 7     case involving a similar fraud, and Mr. Comu's response was,
 8     "Listen, man, I'll agree to anything.  Just plead insanity.
 9     Plead poverty.  That's what I'll do.  That's what I do.  I'll
10     agree to $100 million judgment, and you'll never get it, but
11     I'll agree to it."
12                    And that is essentially what Mr. Comu has done here.
13     He pled guilty to this fraud which involved lying to people to
14     take their money, putting it in his pocket, and then coming up
15     with all these reasons for why what he pled guilty to didn't
16     matter.
17                    And the language that he uses just shows the Court
18     that this is just an effort -- this is more fraud.
19                    He characterizes it as cutting corners.  Cutting
20     corners, that's what he says, not when he got up in the
21     allocution, but in the letter that he wrote to Your Honor that
22     was included in the PSR.  That's how Mr. Comu -- after all of
23     this, that's how Mr. Comu views this.  He cut corners.
24                    He committed a horrible fraud.  The whole premise was
25     that he was going to take this money from these individuals,
```

1    invest it in the company, grow something big, and take the

2    company public, and he didn't do that.  He put it in his

3    pocket, and he divvied it up with the co-conspirators.

4           So we would posit, Your Honor, the fact that you have

5    this candid insight into how he would approach guilty pleas and

6    that his consistent -- that his actions were exactly consistent

7    with that conversation that we provided to Your Honor in

8    Exhibit 4.

9           THE COURT:  I'm assuming your argument wouldn't be as

10   emphatic if, one, let's say he hadn't done that while he was in

11   jail; and, two, he hadn't gotten -- hadn't done what he did

12   while he was on pretrial release.

13          MR. FENTON:  I think that's correct, Your Honor.  I

14   think that's correct.

15          The final point I want to make is that it's important

16   with respect to restitution and also with respect to the loss

17   amount to avoid any unwarranted sentencing disparities.

18          And in the previous -- with respect to the previous

19   individual that you sentenced, the loss amount for Mr. Kadish

20   and Mr. Green was $12,422,311.61.  And the Government filed --

21          THE COURT:  Is it 422 or 427?

22          MR. FENTON:  422.

23          THE COURT:  Okay.

24          MR. FENTON:  I'm sorry, Your Honor.  427.

25          THE COURT:  I've got it both ways on my notes.

```
 1              MR. FENTON:  I'm sorry, Your Honor.  My apologies.
 2              THE COURT:  No, I'm not fussing at you.  I had it
 3    wrong.
 4              MR. FENTON:  And we believe that it's important
 5    that that --
 6              THE COURT:  Stop.
 7              PROBATION OFFICER:  It is 427, Your Honor.
 8              THE COURT:  Thank you.  Thank you.
 9              MR. FENTON:  And we believe it's important to avoid
10    unwarranted sentencing disparity particularly since Mr. Comu is
11    the leader of this fraud and --
12              THE COURT:  That the restitution needs to be that
13    amount?
14              MR. FENTON:  Right.
15              THE COURT:  I understand.
16              MR. FENTON:  Thank you, Your Honor.
17              THE CLERK:  It is 422 for the first one.  They're
18    going to amend that.
19              THE COURT:  Is it 427 or 422?
20              THE CLERK:  422 on one and 427 on the other.
21              THE COURT:  Which one is right?
22              THE CLERK:  427 that was figured out last time.
23              THE COURT:  Well, then, we'll figure that one out.
24              MR. HAGOOD:  Judge, could I say one thing before
25    the --
```

1          THE COURT:  Sure, you can.

2          MR. HAGOOD:  Thank you, Judge.

3          The Shields group would have been tantamount to a

4    receiver had they been permitted to move forward with the

5    Government.  They're not involved in the fraud.  There's no

6    allegation of them being involved in the fraud.  They -- they

7    wanted to take this product to market and make a go of it, and

8    so that's what the Shields -- that was our thinking with

9    Gibson, that the Shields group was tantamount to receiver.  But

10   when we hear the word "co-conspirator" coming our way, that

11   scared the Shields group off, and we couldn't find anybody else

12   that would volunteer to take on that mission.

13         So I just wanted the Court to know we did give that

14   some consideration and thought, but the co-conspirator word is

15   a scary word for most human beings, Your Honor.

16         THE COURT:  I don't know any human beings that it

17   wouldn't be scary for.  I mean -- but, anyway, I get it.

18         I've had that discussion with Mr. Fenton.  He and I

19   have had that long discussion here somewhere.  You know where I

20   am.

21         Any other argument you want to make?

22         MR. POE:  Just, Your Honor, I want to point out

23   that -- I don't want to insult the Court.  I don't want to

24   insult the victims here.  But the idea that, you know, you've

25   got these individuals, these investors, these victims that sign

1  these forms saying that they're an accredited investor, they're

2  signing saying that they've got five times their investment

3  stored up at home, that this is not going to break them, that

4  they have over $1 million in net worth, and now for them to

5  say, like, "I'm a victim here because I didn't read the

6  paperwork" -- well, if they didn't read the paperwork that they

7  signed, how do we know they read the paperwork that has the lie

8  in it, right, the PPM?

9          So that's something that's -- an issue that I've been

10  struggling with through the course of this case.

11          But on the other side is if this is successful, if

12  the Shields group takes this and does well with it, if Maxim

13  does an IPO with this, if Midtown Partners had done an IPO with

14  this, if Comu had done well on Shark Tank, right, and got Mark

15  Cuban or somebody else to invest in this and it had gone great,

16  nobody would have cared that he was paying 40 to 50 percent

17  commissions on this money.  Everyone would have been --

18          THE COURT:  I would have cared if I were an investor.

19  I guarantee you, I would have cared.  You can't say people

20  wouldn't have cared.

21          MR. POE:  Well, it's a -- it's a -- I --

22          THE COURT:  You rip me off -- you rip me off a little

23  bit and lie to me and I'm okay with it if you make me a lot of

24  money, that ain't Ed Kinkeade, I can tell you right now.

25          MR. POE:  Well, and I appreciate that.  But I think

1  that there might be a whole lot of people that would just get

2  the check and say --

3          THE COURT:  Yeah, I agree there might be some, but

4  there's other people going, "Wait a minute."

5          MR. POE:  And so at the end of the day, the ends did

6  not justify the means, right, of what he did.  And we're --

7          THE COURT:  It doesn't.

8          MR. POE:  But I would also point out that there's no

9  evidence, though, of the investments that Mr. Comu brought in

10  personally that there was ever any commission that was paid on

11  it at all, even a 10 percent commission.  I mean, otherwise you

12  would hear the Government, you know, screaming from the

13  rooftops on that, that that money went into his pocket, into

14  some shell corporation, and that's not the case.  So I just --

15          THE COURT:  No.  But there was a whole lot more paid

16  than 10 percent, and that's what he pled guilty to.  We can't

17  go back on it.

18          I get what you're saying is, yeah, they sign those

19  and so -- you know, whatever.

20          Anything else from the Government?

21          MR. FENTON:  No, Your Honor.

22          THE COURT:  All right.  Considering the guidelines --

23          First of all, I'm going to overrule your objections

24  to the presentence report.  And I adopt the findings of

25  Probation Department as the findings of the Court.

1          I will take some of this into consideration with

2    regard to -- because the guidelines are so out of whack in this

3    particular case.

4          Mr. Poe, I do appreciate where my learned colleagues

5    have sentenced people with some similar -- so, you know, I do

6    take that into consideration with regard to what's an

7    appropriate sentence and what's not an appropriate sentence.

8          And so -- excuse me.  I have got more stuff on my

9    desk that I can handle.

10         So considering the guidelines and the factors of

11   3553(a) and making sure that I'm balancing these sentences with

12   the other sentences I've given with other people I've sentenced

13   over my 40 years of doing this, of what I think is an

14   appropriate sentence, and considering Booker and what I think

15   is fair, but using the guidelines to help me stay within a

16   range -- the guidelines, no offense, in this case aren't very

17   helpful.  They're just not.  And you can see that from where

18   other judges have struggled with this, and that's -- you know,

19   that's not unusual.

20         But it is the -- and it's offense level 43, criminal

21   history category I.

22         But taking into account all the things that I've

23   said, it is the judgment of the Court you be sentenced to the

24   custody of the United States Bureau of Prisons for a term of

25   120 months.

1          I'm going to give you credit for the time you've

2  served.  That's on both -- on all counts, because I think

3  that's still within the counts of Twenty-Two and Twenty-Three,

4  but One through Twenty-One, all of them.

5          You want me to recommend Seagoville?

6          MR. HAGOOD:  Yes, Your Honor, please.

7          THE COURT:  I do.  I do recommend Seagoville.

8          And I'm going to give him credit, obviously, for all

9  that time.  I've got November 6, 2019, but if I'm wrong, let me

10 know.

11          He'll need to -- let me go over that.  He'll need to

12 be on supervised release for a period of One through

13 Twenty-Two -- I don't have Twenty-Three -- I think it's one to

14 three years.  For a period of three years.

15          And as conditions of that supervised release -- just

16 a second.

17          (Pause)

18          THE COURT:  Oh, he's got to pay $2,300.00 in special

19 assessments.  That's $100.00 per count.  That's required by

20 law.

21          I'm not going to order a fine, because if you are

22 ever going to pay anything back, I would want you to pay it to

23 these people.

24          And you've got to pay the restitution of

25 $12,427,311.61 to the list of victims.  You've agreed to at

1   least $9 million of that, and I added the other.  And that's

2   going to be jointly and severally that you will need to pay

3   that with John Price, Harley Barnes, Richard Kadish, Richard

4   Green, Suzanne Gagnier, Joe Duchinsky, Joseph Duplain, and

5   Russell Filippo, and Donald Rothman.

6           Payable to the United States District Clerk, 1100

7   Commerce Street, Room 1452, Dallas 75242, payable immediately.

8   Any unpaid balance shall be payable during incarceration and

9   disbursed to the victims identified on the list, and it will be

10  pro rata.

11          If on commencement of your term of supervised release

12  any part of the restitution remains unpaid, you shall make

13  payments on that unpaid balance in monthly installments of not

14  less than 10 percent of the gross monthly income or at a rate

15  of not less than $50.00 a month, whichever is greater.

16          And you shall begin payment no later than 60 days

17  after you're released from confinement and continue each month

18  thereafter until the balance is paid in full.

19          In addition, at least 50 percent of the receipts from

20  gifts, tax refunds, inheritances, bonuses, lawsuit awards, any

21  other receipt of money shall be paid toward the unpaid balance

22  within 15 days of receipt.

23          This payment plan shall not affect the ability of the

24  United States to immediately collect payment in full through

25  garnishment, Treasury Offset Program, the Inmate Financial

 1    Responsibility Program, Federal Debt Collection Procedures Act

 2    of 1990, any other means available under federal or state law.

 3              Interest on the unpaid balance is waived.

 4              Let's see.

 5              Oh, and I'm dismissing the original indictment.

 6    That's what you want me to do?

 7              MR. FENTON:  Yes, Your Honor.

 8              THE COURT:  I do dismiss that.

 9              Is there -- oh, I adopt the terms of supervision set

10    forth in Miscellaneous Order Number 64 outlined in part G of

11    the presentence report except as modified or supplemented by

12    any facts set forth in the addendum and any facts found by the

13    Court today during this sentencing hearing.  And you shall

14    comply with those conditions during the term of supervision.

15              I think that's -- I think that's it.  I think this

16    meets the goals of punishment and deterrence.  And, you know, I

17    am considering how you acted on pretrial release.  I'm

18    considering what you -- this tape recording while you were in

19    jail.  I considered all of that.  And I considered where my

20    colleagues had sentenced individuals that did similar things

21    with similar results.

22              So I think that's it.

23              Anything else?

24              MR. HAGOOD:  No, Your Honor.

25              THE COURT:  Anything from the Government?

1          MR. FENTON:  No, Your Honor.

2          THE COURT:  All right.  Thank y'all.

3          MR. HAGOOD:  Are we excused, Judge?

4          THE COURT:  You are excused.

5          MR. HAGOOD:  Thank you, Your Honor.

6          THE COURT:  Thank y'all.

7          (Hearing adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX
 2   Court's ruling.......................................... 85
 3                                                     Further
                       Direct   Cross   Redirect   Recross   Redirect
 4
     WITNESSES FOR THE
 5   DEFENDANT

 6   NORBERT CHIRASE       36

 7   BRIAN SHIELDS         45

 8                                                     Further
                       Direct   Cross   Redirect   Recross   Redirect
 9
     WITNESS FOR THE
10   GOVERNMENT

11   ████████████         63

12

13   DEFENDANT'S EXHIBITS                                 Received

14      1   Charise resume                                   37

15      2   Organic Registration Review Letter               39

16      3   Washington State Department of Agriculture       39
            Material Registration Certificate
17
        4   Press Release                                    43
18
        5   Photograph                                       43
19
        6   GTX Product Purchases by Companies               41
20
        7   Email from J. Shields to C. Fenton               47
21
        8   Sworn Declaration of Stephen Lloyd               48
22
        9   Sworn Declaration of John Skelton                48
23
       10   Department of Justice Press Release - VanBlaricum 49
24
       11   Department of Justice Press Release - Battie      49
25
```

Todd Anderson, RMR, CRR      (214) 753-2170

12   Department of Justice Press Release - Faulkner      49

13   Department of Justice Press Release - Bise and      49
     Mendez

14   Department of Justice Press Release - Richie        49

15   Department of Justice Press Release - Howard        49

16   "Actual" v. Stated Loss                             10

17   Ward Capital - Declaration of Victim Losses         10

1      I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this 22nd day of January, 2023.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25